JULIA BUDDE, Appellant, v. NATIONAL TRAVELERS BENEFIT ASSOCIATION, Appellee.

INSURANCE:   Causal Connection Between Injury and Act. In an action on a policy which promises indemnity in case of death "resulting from bodily injury effected, directly and independently of all other causes, through external, violent, and accidental means," prima-facie causal connection between an injury and an act is established by testimony tending to show: (a) That, prior to and up to the very time of the act in question, insured was strong and healthy, and was accustomed to the ordinary exertions of physical labor; (b) that, immediately after performing an act of such labor, and before performing any other labor, the insured was taken sick, and later died by reason thereof; (c) that the cause of sickness *was* some act of external violence to his person; (d) that such act was unintentional; and (e) that such act of violence was of such a nature that it might have been received by the insured while performing the work in question.

PRINCIPLE APPLIED:   A policy insured against death "resulting from bodily injury effected, directly and independently of all other causes, through external, violent, and accidental means." Insured was carrying ashes to a wagon, some 40 feet distant, in a two-bushel, two-handled, metal washtub, after the tub had been lifted to a cellar window by another workman. The tub was carried by placing the same against the abdomen. Up to this time, insured was apparently strong and healthy, and was accustomed to ordinary physical labor. To facilitate the work, the two men took hold of the wagon wheels, and slid them over to the sidewalk. This was easily done. Two planks,

with the respective ends on the sidewalk and on the wagon reach, afforded an inclined approach to the wagon. Insured complained of the weight of the tubs of ashes, and the quantity was reduced from 150 pounds to 100 pounds. The work was finished at noon. The other workman did not notice anything wrong with the insured. Twenty minutes later, the insured was seen on a lounge at his boarding place, with his hands over his stomach. He was very pale, and appeared to be sick, and in great pain. The pain was continuous at all times thereafter, but, apparently, was not localized. A medical examination on the same day revealed a little discoloration over the central part of the abdomen. There were rigidity of the muscles of the abdomen, muscular spasms, an accelerated pulse, and a very slight rise in temperature. This condition continued with increased violence up to the time of death, three and one-half months later. A post-mortem examination revealed, as the cause of death, a kink in the bowels, near the ileocaecal valve, with attendant inflammation and septicemia, and serious disorders of the spleen and pancreas resulting therefrom. The evidence tended to show that these conditions would develop gradually. This "kink" was the parent of the other attending disorders. Expert testimony tended to show that, while there were numerous causes for "kinks" in the bowels, this particular injury was caused by some external violence. There was expert testimony tending to show that the injury might have been caused by carrying the ashes.

*Held* to present a prima-facie case for recovery.

**EVIDENCE:** Res Gestae. *Res gestae* does not embrace matters of mere opinion, nor narratives of past events. So held as to what an injured party said about his injuries, an hour after they occurred.

*Appeal from Jackson District Court.*—A. P. BARKER, Judge.

DECEMBER 14, 1918.

ACTION for indemnity on a life insurance policy resulted in a directed verdict for the defendant and judgment thereon. Plaintiff appeals.—*Reversed.*

*J. C. Campbell* and *Wolfe & Wolfe,* for appellant.

*F. D. Kelsey* and *Carr, Carr & Evans,* for appellee.

LADD, J.—I.  A policy insuring Elmèr F. Budde against "loss of life, limb, sight and time, resulting from bodily injury (hereinafter called such injuries) effected directly and independently of all other causes through external, violent and accidental means," was issued by the defendant, October 12, 1914.  In event of accidental death, the indemnity stipulated was $2,000.  On May 30, 1916, the assured was engaged in removing ashes from a cellar in Bellevue, when he became ill, and died on August 15th, following.  One Steil placed the ashes in a metal washtub, and lifted it to the cellar window, from which Budde carried it to a wagon, into which he emptied the ashes.  The petition alleged that, in the course of this work, it became necessary to move the wagon closer to the sidewalk, and that, while lifting or pulling one of the wheels, deceased was injured by reason of a sudden shift of the weight of the wagon, and that this subjected him to an unexpected strain, which, directly and independently of all other causes, produced an abscess of the pancreas and peritonitis, resulting in death.  It also alleged that the ground was rough and muddy; that it was elevated a foot above the grade of the sidewalk; that, in carrying the ashes, the tub rested against deceased's abdomen; and that, in passing over the wet and slippery ground, he slipped, and strained himself, producing an abscess of the pancreas, which resulted in peritoneal inflammation and death.  Again, the petition charged that, in carrying it, the tub of ashes pressed against his abdomen; and that, while crossing the rough, muddy ground, the assured felt a sudden pain in his abdomen, and was compelled to quit work, and, "as result of said strain, directly and independently of all other causes," he sustained an injury, such as previously mentioned.  These allegations were put in issue, and the main controversy is whether the evidence was sufficient to carry the cause to. the jury.  The appellee

1. INSURANCE: causal connection between injury and act.

does not argue the case solely with reference to the pleadings, but only as to whether the evidence was sufficient to make out a case for the jury.

The deceased, previously to May 30, 1916, had enjoyed good health, and had worked in a livery barn, and generally at manual labor about town. On that day, he was engaged, with one Steil, in moving ashes, as stated. The ashes were carried in a two-bushel washtub. After a few tubs of ashes had been removed, it was thought that the wagon was not close enough to the sidewalk, and the two took hold of the wheels,—Budde, the wheel nearest the sidewalk,—and slid it over. This was easily done, as the lawn was newly made and slippery. Two planks were then so placed as to extend from the sidewalk to the reach, so that Budde could walk up them to empty the ashes in the wagon, and he carried the tub, having two handles, resting against his stomach. Sometime during the forenoon, he complained that the tubs were being loaded too heavily, and thereafter, Steil placed about 100 pounds of ashes in each, instead of 150 pounds, as he had been doing. The work was completed at twelve o'clock, and together they walked away to dinner. A brother of deceased's saw him lying on a lounge, about 20 minutes later, with his hands over the pit of his stomach, "very pale, and as though in great pain," and saying that he did not care for dinner. Steil met him at about one o'clock P. M., when he appeared pale, "like he was sick," and holding his hand over the pit of his stomach. He suffered pain in his right side for some weeks, gradually growing worse.

On the same day, at about eight o'clock in the evening, he consulted Dr. Hanske, when, according to the doctor, he complained of pain in his abdomen, showed some prostration; and, on examination, it was found that he had "a little discoloration over the central portion of the abdomen." There was continuous rigidity of the muscles, muscular spasms, and the pulse was accelerated, and there was a

very slight rise of temperature. The doctor treated him, up to the time of his death, primarily "for an injury which later resulted in what he supposed, and by diagnosis, was septicemia. Septicemia is a condition applied to invasion of microbic or bacterial elements into the blood tissue, without any visible foci of operation." The pain was continuous, though not apparently localized; there was general rigidity of the abdomen; the treatment was "rest and palliative treatment through slight stimulation and liquid foods, regulating of diet, and in a general way used cold applications." The condition "was obscure, and we allowed him to suffer, hoping that some symptoms might become localized and show themselves." Narcotics were resorted to, during the last two weeks of his illness.

"Q. Basing your answer on your previous knowledge of Mr. Budde's physical condition, and the fact that he had septicemia, what would you say was the cause of that septicemia,—what produced that? A. There was some external force that produced that condition, in my estimation."

On post-mortem examination, evidence of peritonitis fibrin and flakes was found in the lower pelvis, indicating that deceased had peritonitis. About two feet from the ileocaecal valve, there was a kink in the bowel, that showed fibrous adhesions, indicating inflammation there. The spleen was considerably enlarged, and hard. The pancreas also was enlarged, and at the opening into the small intestine was an abscess, the size of a goose egg.

"Q. What, Doctor, could produce, or rather, what would naturally produce, the kink in the bowel which you discovered there in the post mortem? A. An injury could produce it, an ulcer could produce it, or any portion of the bowel that the mucous surface had been injured, or any condition that would produce an inflammatory change in the intestines might produce it through inflammation caused by contractions. Q. Now, Doctor, what would be the outward

effect apparent on man who was suffering from abscess of the pancreas? A. Well, in the beginning, it would be just like any other form of septicemia, and as it progressed, you would have that same picture, with prostration and general emaciation of the body. Q. Is that gradual development, or is it speedy? A. It is gradual development."

Dr. Dennison had observed deceased from May 30th on, and was of opinion that he was suffering from peritoneal abscess or typhoid fever; that he gave evidence of pain and prostration and peritonitis; that, at the post mortem, "there were fibrin and flocculus deposited in the fluid of the abdomen and generally, as had been testified by Dr. Hanske." This physician was of the opinion that the septicemia was caused by a microbic invasion from where the kink in the bowel occurred, "where there was evidence of inflammation, deposits of fibrin and adhesions;" and testified that:

"There are numerous causes for kinks in the bowel, one of which is injury, traumatism, and strain, unnatural peristalsis (meaning 'worm-like action of the bowels'). Excessive laxatives will sometimes cause the same thing. Q. Doctor, you may state whether or not, under this statement of facts, the kink in the bowel, such as you found and discovered there on post mortem, could have been produced,— that is, where a man 32 years of age, weighing 140 or 145 pounds, 5 feet 8 inches high, engaged in carrying baskets of ashes weighing from 100 and 150 pounds, by holding the basket against his abdomen and carrying it 40 feet to a wagon, and dropping it into the wagon,—whether that could have produced a kink of the bowel such as you describe. A. Such a condition could have been produced in that way."

On cross-examination, he testified that the loop in the bowel could have been caused by carrying heavy weight, although he could not tell it, and that:

"There are instances on record of the same conditions

producing the same results.   Q. That is, an unusual strain
upon the muscles?   A. I judge it is more of a twist, that
one gets into,—would be required to do that than ordinary
lifting.   Q. That is, the twisting of the muscles in an un-
usual position?   A. A pressure on the abdominal contents."

He thought a kink might be caused by "increased ver-
micular action of the bowels," or by the "natural spasmod-
ic movement of the bowels," or "from a weakness in the
wall of the gut," or "from gas formation," as from "fer-
mentation of food or other things," or "external violence,"
or from "injuries."

"Q. If there were peritonitis or septicemia in the bowel,
it might cause the loop in the bowel, might it not?   A. Well,
a loop might occur with those conditions.   I don't say that
it would be the cause of it, but it might occur with it."

He testified, also, that the inflammation would be pro-
duced by the loop, and that, "if peritonitis with the result-
ing fluids thrown out, it would be possible for that to glue
itself on or to become adhered and so kink."

Dr. Smith also testified as an expert, and thought that
the mere carrying of the ashes would not "ordinarily cause
decedent any trouble."

A hypothetical question reciting the facts was then pro-
pounded to the witness, and he was asked:

"What do you say, in your judgment, as to whether,
in the carrying of the ashes, he in some way injured the in-
testines?   A. My opinion would be, there must be some ex-
ternal cause that produced the conditions described."

The doctor was then asked to base his opinion on the
assumption that deceased was in good health, a man of
32 years, engaged in moving ashes, as he was, carrying
them in a tub, resting against his abdomen, from the win-
dow to the sidewalk and up to the boards which stretched
to the reach of the wagon, and that the post mortem re-
vealed a kink in the bowel,—what he would say produced

that condition of the bowel at that point. He answered that "it would require some quick move, slip, other than ordinary handling of a basket, to produce that condition." The answer was stricken out, on motion, and, the question being repeated, witness answered, "The labor that he was engaged in." Objection as a conclusion of witness on a matter not the subject of expert testimony, and incompetent, because an invasion of the province of the jury, in calling for an ultimate fact, was overruled; and a motion to strike out on these grounds was sustained.

The physician agreed that the loop of the bowel was the primary cause, resulting in septicemia, which produced other conditions mentioned. From this evidence, then, the jury might have found that, when Budde began the removal of the ashes, he was sound in body; that, within a few minutes after he ceased work at noon, he was afflicted with great pain in the abdomen, over the central portion of which there was "a little discoloration;" that his bowel had, in some manner, become looped; and that this was the cause of his death. While such looping may have been caused otherwise, the physicians were of the opinion that, in this case, it was due to external violence. Such opinions were held admissible in *State v. Hessenius,* 165 Iowa 415. Of course, an expert may not express an opinion as to what produced the kink in the bowel, as was, in substance, asked of Dr. Smith; for that was precisely what the jury was to determine, and was not the subject of expert evidence. Such was the holding in *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664, and other like decisions. The jury, then, might have concluded that the loop of the bowel was consequent upon some external violence, and that, as deceased was in apparent good health in the morning, he suffered from such violence in the forenoon of May 30th, and while he was engaged in moving the wagon, or carrying the ashes. But such work ordinarily would not produce such a result.

Dr. Dennison suggested, in answer to the question, "That is an unusual strain upon the muscles?"  "I judge it is more of a twist that one gets into, would be required to do that than ordinary lifting. Q. That is, twisting of the muscles in an unusual position? A. A pressure on the abdominal contents." It certainly was competent for an expert to explain how or in what manner the loop of the bowel might have been caused. If, by some twist of the muscles of the abdomen, or slip, or other happening, the loop was caused, this could not well have been intentional, or by design, and might have been found to have been accidental. In other words, if what deceased was shown to have been doing would not, of itself, have caused the injury, and it was produced by external violence, as might have been found, then something out of the ordinary,—that is, unusual,—must have happened, to have produced the result. The case, as we think, falls fairly within the principle of *United States Mut. Acc. Assn. v. Barry,* 131 U. S. 100 (33 L. Ed. 60). It appears that Dr. Barry, in leaving a railway station platform, jumped to the ground below, a distance of four or five feet. In some way not shown by any direct proof, he sustained a jar, which, it was claimed, caused an injury to his bowels, resulting in death; and, although there was no testimony that he slipped or fell, or that he alighted in any other manner than intended, it was held that the jury was at liberty to find that, by some unexpected or unforeseen or involuntary movement of his body in the course of his descent to the ground, the injury was caused. As to the sufficiency of the evidence to support a finding that the injury was accidental, the court said:

"It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means

by which the injury, if any, was sustained,—was caused; that the question was, whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted through accidental means. The jury were further told, no exception being taken, that, in considering the case, they ought not to adopt theories without proof, or substitute bare possibility for positive evidence of facts testified to by credible witnesses; that, where the weight of credible testimony proved the existence of a fact, it should be accepted as a fact in the case; but that where, if at all, proof was wanting, and the deficiency remained throughout the case, the allegation of fact should not be deemed established."

In *Martin v. Travelers' Ins. Co.,* 1 Fost. & F. 505, the insured, in the course of his business, lifted a heavy weight, and injured his spine. Recovery was permitted, over objections that he had not sustained the injury by reason of an accident. This was a case at *nisi prius,* but is cited with approval in the opinion in the *Barry* case. See, also, *North American Life and Acc. Ins. Co. v. Burroughs,* 69 Pa. St. 43 (8 Am. Rep. 212) ; *Lickleider v. Iowa St. Trav. Men's Assn.,* 184 Iowa 423.

In *Standard Life and Acc. Ins. Co. v. Schmaltz,* 66 Ark. 588 (74 Am. St. 112), it appeared that the assured, Schmaltz, was a strong, healthy man, weighing about 170

pounds; that he was a railroad machinist, and had been for several years, and had frequently lifted cylinder heads from the engines, without accident or injury; that this was usually done by machinists so employed, and was not a dangerous undertaking. On the day in question, the cylinder was unusually warm, and he used some waste, to protect his hands. As the head stuck, he picked up a steel bar and removed it; immediately dropping the bar, he caught the cylinder head as quickly as he could, in order to prevent it from falling, and while he was in a stooping position, standing on his toes. He was immediately taken sick, his stomach filling with blood, which he vomited in great quantities, and his face became pale, and he suffered pain; and death resulted, as was testified by his physician, from the rupture of a blood vessel in his stomach. From this evidence, the court held that there was sufficient evidence to sustain the verdict that the means of death was accidental, the court declaring that the facts were similar to those in the *Barry* case.

In *Horsfall v. Pacific Mut. Life Ins. Co.*, 32 Wash. 132 (98 Am. St. 846), the insured was a strong and apparently healthy man of 58, accustomed to lift from 200 to 250 pounds without difficulty; and, immediately after he had lifted one end of a bar weighing from 350 to 400 pounds, he became sick and "deathly pale." His extremities became cold; perspiration stood on his face. The exertion had caused violent dilation of the heart. The court held that:

"The result certainly was unexpected. It did not take place according to the usual course of things. If, instead of a sprain of the muscles of the heart, the deceased had sprained the muscles of his back, or arm, or ankle, it certainly could not have been reasonably claimed that the result was not due to accident. The fact that the heart was dilated or ruptured was none the less an accident, according to the usual acceptation of the term, and according to

the definition above given. We think the evidence shows an accident, within the meaning of the policy."

In *Atlantic Acc. Assn. v. Alexander,* 104 Ga. 709 (42 L. R. A. 188), the insured was a hale, hearty man, whose occupation was that of a blacksmith. He had occasion to use a heavy sledge-hammer, and had done so many times, in the course of business. On the occasion in question, in striking a slanting blow, he suddenly felt a severe pain in the lower part of his abdomen. The injury proved to be a rupture, producing hernia, which injury resulted in death, after a few days. In holding that a case was made out for the jury, the court said:

"Taking all the facts together, the fact of his previous good health, the fact that he had many times before used the hammer, the sudden pain after the blow of the hammer, and other facts which appeared, the jury could properly infer that the act which preceded the injury was something unforeseen, unexpected, and unusual, and that the injury resulted directly and immediately from such act, and was, therefore, produced by external, violent, and accidental means."

In *Ludwig v. Preferred Acc. Ins. Co.,* 113 Minn. 510 (130 N. W. 5), the insured appears to have been without physical infirmities; and, during the fifth or sixth inning in a game of baseball, attempted to "steal second," and slid, head foremost, on his stomach, the last nine or ten feet of the distance, stopping with his stomach over and upon the second base, which consisted of a piece of cement sidewalk paving block or slab, about 2 inches thick and 12 inches square, rough on one edge and smooth on the others. He was declared "out," and, according to some testimony, "stopped with his arms across his stomach." In walking back, he indicated that he was hurt, and where, but continued to play until the end of the game, though manifesting pain. A day or two later, a physician was called. He

gradually grew worse, until he was taken to a hospital, and operated on for appendicitis. Death resulted from septic peritonitis. The autopsy revealed a gangrenous condition of the appendix. Two enteroliths, or concretions of stony formation, composed of hardened fecal matter, were found to be where the appendix was ruptured. More than a year previous, he had consulted a physician, who found some tenderness over the region of the appendix, and that he was suffering from a mild case of appendicitis, catarrhal in nature. Upon the administration of a laxative, the difficulty seemed to have at least subsided. An instruction that, if the "fall on the cement slab on the base is by you found, by a fair preponderance of evidence, to be such exciting cause, and to be external, violent, and accidental injury, the amount of the policy would become payable, on the proper notice and proof being made."

These authorities amply sustain our conclusion that a jury might have found the death of Budde to have been caused by external, violent, and accidental means. The holding in *Feder v. Iowa St. Trav. Men's Assn.*, 107 Iowa 538, save on careful reading, would seem adverse to this conclusion; but there, the assured was suffering from tuberculosis, and, though his health had been improved by treatment, he was still in a debilitated condition. Preparatory to leaving the room in which he was, he went to the window to close the shutters, and, in attempting to do so, stood on his toes, and reached over the chair toward the shutter, and, as he did so, blood began to flow from his mouth. He died within a few minutes. Manifestly, he was incapable of making much effort physically, without subjecting himself to injury. The effort to close the shutters, which could not have required much exertion, ruptured the artery. So far as it appears, he may not ever have made such an undertaking before. These facts distinguish the case from that at bar. Here, the deceased was in good health, and strong, and engaged in

manual labor such as he was accustomed to perform. He suffered an injury which the jury might have found to have been produced by external violence, and not likely to happen in the work in which he was engaged; and the jury might have reached the conclusion that the injury was accidental. The court erred in directing the jury to return a verdict for defendant.

II. Steil testified that he and Budde quit work at about twelve, and went to dinner; that he noticed nothing wrong with him; but that, when he next saw him, at one o'clock, he "looked kind of pale," and "like he was sick."

2. EVIDENCE: res gestae.

"Q. Now, without stating what Mr. Budde said to you, you may state whether or not he made any complaint at that time as to whether he was suffering pain or otherwise. A. He didn't say anything to me. He was suffering pain, but he said he had a rupture in his side, —he thought he got it loading ashes."

Defendant moved to strike out this answer as a merely voluntary statement, hearsay, and for that reason incompetent, as a self-serving declaration. This motion was sustained. A like ruling was made in the course of the examination of a brother of deceased's. Both rulings are to be approved, on the grounds that the answers disclose that the assured was merely expressing an opinion as to how he was injured, and in any event, relating a past happening. The authorities are agreed that, in these circumstances, what may be said is not to be regarded as part of the *res gestae.* —*Reversed.*

PRESTON, C. J., WEAVER, GAYNOR, and STEVENS, JJ., concur.

EVANS, J., takes no part.

SALINGER, J. (dissenting). I. The defendant issued a policy to decedent, agreeing to indemnify "against loss of life resulting from bodily injuries effected, directly and in-

dependently of all other causes, through external, violent, and accidental means." The first difference that constrains me to differ from the majority is its holding it is immaterial whether decedent was injured, as his petition declares, and that it is sufficient to make a case for a jury if, no matter upon what the petition plants itself, there is evidence that decedent sustained *any* bodily injury effected solely through external, violent, and accidental means. This view of the majority would make it unnecessary to inquire upon what ground the petition seeks a recovery. Consistently enough, the majority opinion makes no claim that there is any evidence that bodily injury was effected by the causes declared on in the petition,—i. e., that decedent was injured either through carrying ashes or helping shift the position of a wagon; no claim that thereby decedent "slipped and strained himself." In one word, the first difference between us is that, in my opinion, the plaintiff made no case for a jury unless he had some evidence that decedent slipped and strained himself, either by carrying ashes or helping shift the position of the wagon: while the majority holds that the allegations of the petition which thus limit the suit of the plaintiff are immaterial; that a case for a jury was made out on this head by merely adducing evidence that decedent did carry ashes and did help shift the position of the wagon; that, some hours thereafter, he, who had been healthy before, became sick; that, in the course of some two months, he died; and that an autopsy disclosed conditions alleged in the petition, and others not alleged therein. The attitude of the majority is that, for this day and date only, there shall be a dispensation absolving this plaintiff from supporting his plea by the proof. If there be no evidence of a slip, there can be no evidence that a strain resulted from a slip, or that conditions subsequently developed were due to a slip. If, on an allegation that life was lost because carrying ashes or helping shift the position of a wagon ef-

fected a strain or slip, the plaintiff may go to a jury without any evidence of the matters alleged, and have a verdict on evidence that something other than alleged injured the decedent, then, manifestly, plaintiff has a recovery without any evidence of the case that he has brought into court. If that is the law, then plaintiff need not file a petition at all, and may have a verdict by exhibiting his policy. Should he go through the useless formality of filing a petition, he need but allege that decedent came to his death by "some" accidental means; and if defendant move for more specific statement, his motion should be overruled. Or plaintiff may allege that decedent came to his death because of the explosion of a revolver, and have verdict on proof that the cause of death was being struck by a brick that had fallen from a building,—for both are accidental means of injury, and within the policy. With one stroke of the pen, the majority has ruled that one who defends a suit on a policy is not entitled to prepare for trial. For he may not stop his investigation when he is satisfied that plaintiff cannot sustain his petition, but must do the best he may to meet evidence not foreshadowed by the petition, after such evidence is put in on the trial. On this rule, he may, of course, not move for a continuance on the ground of surprise, because it is his duty to assume that the petition will be cast aside, and to prepare to meet any and all things that make liability on the policy without reference to the limitations in the petition. The rule allowing amendment to meet the proof no longer exists. What need to so amend when there may be recovery without amending? On the reasoning of the majority, should a defendant in a suit on policy set it out, and select two from ten bases of forfeiture therein contained, he may avoid the policy though he failed to prove these two, if he proved one or more of the other eight. The majority overrules *Monaghan v. Equitable Life Ins. Co.*, 184 Iowa 352, without mentioning it, and gives to that case

also the effect of a stamp on a railroad ticket that the same is good for that day and date only. In that case, the exact holding is that, no matter how liable the defendant might be, a directed verdict in his favor will be affirmed if claim against him has been restricted by the pleadings of the plaintiff and the concession of his counsel as to what in the pleadings is relied upon for the right to recover, and there is no evidence to support the claim of the pleading as thus restricted.

To the same effect, and, in effect, overruled by the majority without mention, is *Doyle v. Willcockson,* 184 Iowa 757; *Gibson v. Iowa Legion of Honor,* 178 Iowa 1156; *Ball v. Davenport,* 170 Iowa 33; *Seymour v. Chicago & N. W. R. Co.,* 181 Iowa 218; *Koontz v. Iowa City St. Bank,* 183 Iowa 1353; and *Thomas v. Long,* 182 Iowa 859. Indeed, the majority overrules ten thousand decisions, and every text on the subject of plea and proof. I could well be accused of pedantry for indulging in elaborate argument or citation on the proposition that the recovery is limited by the petition, and cannot be had without proof of the petition, were I not justified in so doing by the astonishing fact that the majority has challenged and destroyed this rule. In the last analysis, the opinion recurs in type to that apocryphal Irish jury that found the defendant guilty of murder, though the alleged corpse walked into the court room before the jury retired, and who explained the verdict with a statement that the jury knew the defendant had stolen a widow's cow.

1-a

It follows no opinion testimony to the effect that conditions found on the autopsy were due to "some" external cause is of weight; and that it is of no importance that the spleen was hard and considerably enlarged; neither spleen or any injury to it is mentioned in the petition. So of a kink found in the bowel. Moreover, if this lack of plea as to

the kink is waived in argument, still, the evidence that the kink was found is of no probative weight, because the cause of the kink is left in equipoise. The witnesses for plaintiff say the kink might naturally be produced, not only by some strain or anything that happened in the work that decedent did, but could as well be produced by an ulcer, or because the mucous surface of some portion of the bowel had been injured, or by any condition that would produce an inflammatory change in the intestines, causing inflammation through contractions, or by something like unnatural peristalsis, or the taking of excessive laxatives, or from a spasmodic movement of the bowel, without outward cause of any kind, or from weakness in the wall of the gut in that part, or by gases or gas formations due to fermentation of food, and other things.

II.    The next difference is because, in my opinion, the majority holds that plaintiff had a jury case on an allegation that an abscess of the pancreas was the sole cause of death, although there is no evidence that either such abscess or anything else was the sole or any cause of the death. I do not understand it to be matter of common knowledge that any abscess of the pancreas is necessarily lethal, or that any presumption exists that it was any cause of the death. If the objection that other things found on the autopsy are not pleaded be passed, there is no evidence that these were the sole cause or any cause of the death. In fact, the plaintiff expended all his force on proving the cause of what the autopsy disclosed, and made no effort to prove the relation of these to the death. In my opinion, the plaintiff must be defeated because he has no evidence of what did cause the death of his assured.

III.    On the theory of the opinion, it is idle to consider what relevant testimony there is. But I think the inquiry is a controlling one. I am content to demur to the facts set out in the opinion of the majority, and think the

statement of facts therein is demurrable, on the ground that it discloses no evidence tending to support the petition. The opinion rightly states the plea to be that, through carrying ashes or helping shift a wagon, decedent "slipped and strained himself, producing an abscess of the pancreas, which resulted in peritoneal inflammation and death." The evidence addressed to this allegation is that decedent did carry ashes in a tub, with the tub held against his abdomen. The only eyewitness mentions no slip, though he must have seen it, had one occurred. He says that the wagon weighed 1,200 to 1,500 pounds; that they slid it "over in a different position;" and the witness says they "had no trouble about that, moved it easy, the ground was muddy, and it slipped over." He adds that decedent made no complaint, and returned to work in the afternoon, worked all afternoon, and still made no complaint. The only other testimony is that decedent held his hand on his stomach during the noon hour, and declined to eat, returned to work, went to a doctor that evening, and there was found a little discoloration over the central portion of his abdomen, and continuous rigidity of the muscles, muscular spasms ensued; that decedent, who had been in good health in the past, never became well from then on; that he died in about two months; and that, on the autopsy, an abscess of the pancreas was found. I have already said all I care to about the fact that an enlargement and hardening of the spleen and a kink in the bowel was also found. I am not overlooking that the condition of the decedent might be some evidence that he had suffered a strain due to a slip, but have to say that finding an abscess of the pancreas, or, if you please, an enlarged and hardened spleen and a kink in the bowel, confessedly causable in many ways, is no evidence that decedent ever slipped and thereby strained himself,—and that, if it be, since the testimony of the plaintiff excludes the possibility of a slip while and during the time the work declared on

in the petition was done, if the condition found be any evidence of any slip, it must be held that the slip did not occur during the work, and at the time fixed in the petition. I am abidingly of the opinion that the learned trial judge was right in directing a verdict for the defendant, upon the expressed ground by him that there was no evidence of any quick movement or slip.

IV. There could not well be a more effective confession of error than is furnished by an avoidance argument made by the majority. That is, since counsel for appellee has made no argument in this court, except to claim that defendant is under *no* liability, appellee has conceded that a directed verdict is erroneous which holds that there is no liability under the petition. If one assume the ruling below was that there was no liability, that includes holding there is no liability on the petition. Were that so, the relief due on appeal would be to limit the decision below to one that there is no liability on the petition. If counsel for appellee made no argument, a correct judgment would not be annulled because such judgment was accompanied by an erroneous judgment. And so of a claim in argument by appellee that defendant was under *no* liability. The most that could effect is that we should not sustain the claim in so far as it is too broad. That appellee claims more than he is entitled to, is no warrant for holding he has conceded away what he is entitled to. The majority has made it the safer course for the appellee to offer no aid to the court. The sole justification for resorting to such a startling rule of appellate practice is, "any port in a storm."