ELIZABETH MARTIN, Appellant, v. INTERSTATE BUSINESS MEN'S ACCIDENT ASSOCIATION, Appellee.

INSURANCE: Accidental Means Contrasted with Accidental Results. It may not be said that one died of *accidental* means, when the cause of his death was acute indigestion of food voluntarily selected and eaten, with full knowledge of its wholesome or unwholesome character.

APPEAL AND ERROR: Scope of Review—Directed Verdict. An order for a directed verdict will not be disturbed if all the evidence received and all the evidence improperly rejected, but before the court, would not sustain a contrary verdict.

*Appeal from Polk District Court.*—THOMAS J. GUTHRIE, Judge.

NOVEMBER 15, 1919.

ACTION on an accident insurance policy. Verdict directed for the defendant. Plaintiff appeals. Opinion states the facts.—*Affirmed.*

*William G. Clark* and *F. L. Groesbeck,* for appellant.

*Robert M. Haines,* for appellee.

GAYNOR, J.—The defendant is a mutual benefit life and accident association. On the 22d day of October, 1917, it issued to one John G. Martin a certificate of membership, bearing date October 22, 1917, whereby it

1. INSURANCE: accidental means contrasted with accidental results.

undertook and promised to pay to the beneficiary therein named the sum of $5,000, upon the death of said Martin, but only in the event death was caused by accidental means. The plaintiff is the beneficiary named therein, and brings this action to recover the amount therein provided, under the terms of the certificate.

John G. Martin died on or about March 2, 1918. It is claimed that his death was caused by accidental means. The only question presented here is whether or not he came to his death by accidental means.

The plaintiff, in her petition, states her claim in the following language:

"The death of decedent was accidentally caused by reason of certain food taken by the decedent into his stomach while absent from home, which food was accidentally, and without the knowledge of the decedent, of an unwholesome and dangerous character, whereby, without intent on decedent's part, or on the part of the person serving the same, said food accidentally caused decedent's stomach and bowels and the contents thereof to become fermented, and caused a violent fermentation and infection of decedent's bowels, whereby a violent retching of the stomach and bowels ensued, and a foul and dangerous condition of the bowels was

so caused, whereby decedent suffered great and dangerous pain, and his system became infected and foul and dangerously inflamed; thus and thereby decedent's death shortly thereafter resulted, and was caused by reason of the facts hereinbefore stated."

The defendant admits that the death of the insured was caused by reason of food eaten by him, and fermentation in his stomach from some cause unknown, but denies that the death was from accidental means.

A jury was impaneled to try the cause. At the conclusion of the evidence, the court directed a verdict for the defendant, and plaintiff appeals.

In the trial of the cause, the plaintiff offered certain evidence to which the defendant objected. Thereupon, the court retired to a private room, out of hearing of the jury, and received the evidence to which objection was urged. After the evidence was given and taken down by the shorthand reporter, the court ruled that it was not competent evidence to be heard by the jury in the trial of the cause. This evidence was all preserved, and is now in the record before us. In the determination of this case, we will consider all the competent evidence offered, as well as that received, although we are of the opinion that the court erred in its ruling on some of the evidence offered, and that it should have been admitted. But since the case did not go to the jury, and since the court heard all the evidence and made its ruling directing a verdict for the defendant, we will treat the evidence as all before this court. If, after giving to all the evidence its fullest consideration, and indulging in all reasonable inferences that could be drawn legitimately therefrom, we find that no verdict for the plaintiff, based upon that evidence, would be permitted to stand, we will not reverse the case for the error committed in its exclusion, although we find affirmatively that it

2. APPEAL AND ERROR: scope of review: directed verdict.

was competent, and should have been admitted. While prejudice is presumed from the exclusion of competent and material testimony in the trial of the cause, and while we ordinarily assume prejudice from erroneous rulings against the complaining party, yet, when we find from the record that, had the error not been committed, the result must have been the same, we cannot say that the error prejudiced any substantial rights of the party against whom it was committed.

If all the evidence offered and rejected, taken with all the evidence received, does not make a case for the jury, it would be idle to reverse the case for error committed in refusing it. This is certain: that, if admitted, it would not have entitled the plaintiff to the relief prayed for; so, in the determination of this case, we will take all the evidence now in the record before us, that which was rejected by the court as well as that received by the court, and determine therefrom whether or not the insured came to his death by accidental means, or rather, whether the showing upon this point is such that the jury could have so found, after carefully and honestly and intelligently considering the same.

For a definition of accident and accidental death approved by this court, see *Carnes v. Iowa St. T. M. Assn.,* 106 Iowa 281, 285; and *Hanley v. Fidelity & Cas. Co.,* 180 Iowa 805, 823, and pages following, and cases therein cited.

This brings us to a consideration of the evidence before us.

The deceased, on the day when it is claimed the accident occurred which produced his death, was in the employ of one Zaun & Zaun, merchants in the city of Des Moines. About 10 o'clock on the morning of the 1st of March, 1918, he was engaged in sorting oranges, separating those which were marketable from those which were not marketable. He ate three oranges, just prior to that time. Whether

he ate the marketable or the unmarketable oranges does not
appear.   His business was to note and separate the good
from the bad.   The oranges which he ate were selected by
him from the entire body of oranges in his charge.   There is
no direct evidence that any of the oranges were unwhole-
some or unfit for food, except this: After he had eaten
these three oranges, he called his brother-in-law, who was
working in the same building, to him, and gave him two
oranges selected from the pile, and said: "Take these, and
put them away for your lunch at noon."   The brother-in-law
testifies that the oranges handed to him were very large,
with a very small part affected; that he cut one, and cut
out the affected part, and then tasted it.   It seemed to be
bitter, and so he threw it away.   It is apparent that, since
deceased was charged with the duty of selecting and sepa-
rating the unmarketable oranges from the marketable ones,
he had a discriminating judgment upon this point.   We
may assume, from the fact that he was charged with the
duty of separating the good from the bad, that there were
some of the oranges that were not marketable: at least, the
jury could have found this.   It would be a legitimate infer-
ence from the facts shown.   However, the only direct evi-
dence that any of the oranges in his charge were affected
is the evidence of the brother-in-law, touching the oranges
handed to him.   These oranges tasted bitter, and had a
small part affected.   At the time the oranges were handed
to his brother-in-law, deceased said that many of the or-
anges he was sorting had a green speck on them, and that
would make them unsalable; but there is no evidence that
the oranges eaten by deceased were spotted and specked,
or that they were not sound oranges.   On the morning of
the day that he ate these oranges, the testimony shows, de-
ceased was in good health.   He returned to his home in
the evening, and complained of being bloated, and his
stomach was distended, and he was unable to eat much,

if any, supper. After supper, he lay upon the lounge, and loosened his belt, and his stomach appeared to be bloated. He said he didn't feel well; that his stomach was all knocked out; that his condition was due to something he had eaten. He continued to get worse, and died about 2 o'clock the next day. The evidence further disclosed that it was the custom of the insured to eat a very light break-fast; that his heartiest meal was the noonday meal; that, because of having eaten a light breakfast, he was always more or less hungry about 10 o'clock in the morning; that it was his custom then to "mince around the store," to eat fruit or cakes or something like that. Whether he did "mince around the store" on that day, or whether he ate his noonday meal, this record does not disclose. He died of acute indigestion, or what is known in medical science as acute gastritis. After he returned home on this evening, in the condition hereinbefore recited, he was given an injec-tion, and the stool that passed was examined by a doctor who was called to attend him. The evidence shows that there were pieces of oranges in it, undigested; that the stool exhaled a good deal of odor, and that gas was emit-ted; that the stool was green and yellow. The doctor says that, from the stool, it was his judgment that some putre-faction was going on in connection with the digestive proc-ess, or it would not have emitted the offensive odor; that the undigested orange would make the trouble from which deceased was suffering; that he did not find anything else that would produce the trouble in the stomach, except the undigested orange. Since the doctor's testimony has di-rect bearing upon the conclusion which must be reached in this case, we set out his testimony practically in full:

"I didn't find anything else that would account for the trouble in the bowels, except the undigested orange. I think that he had acute infection from food he had taken in the shape of oranges, and I think that was the probable

cause of his death. I think that the illness itself was probably caused by infected oranges. My opinion is that the undigested character of the orange indicated that it had been the cause of fermentation and bloating in the man's bowels. It is my opinion, from the stool and the apparent undigested character of the orange, that this caused fermentation and bloating. I base this opinion upon the fact of the odor, and the stool showing undigested orange. I found nothing in connection with the stool and the history of the case that, in my judgment, would explain the condition in which I found Martin, and his death, except the orange there was in the stool, and the condition of the orange as found in the stool. There is nothing else that I discovered that would explain this condition. My professional opinion is that it was caused by something he had eaten. He died of acute indigestion. This might happen to anybody."

He was asked this question, on cross-examination:

"You can't tell what caused the indigestion, can you? A. From the condition we found there, we think we know what caused it, when we found the orange in the stool. I thought it was from eating the orange. Q. If the orange were perfectly good, the stomach might be in such condition that he could not digest it? A. Yes. Q. From natural conditions, that is true, isn't it? A. It is true. It is true of all food: that you may take perfectly wholesome food, and, on account of the condition of the stomach, not digest it. That is true. Q. Do you know anything about the reason why these oranges did not digest? A. No, sir. I don't think anybody could tell what kept these oranges from digesting. Q. When food is taken into the stomach and fails to digest, it does ferment, doesn't it? A. As a rule, it does. If you don't get digestion, you get fermentation, to a certain extent. You might get undigested food and all that in the bowel, but you ought not to get the odor, the terribly

offensive odor like this was. You might get some odor. Q. Now, the oranges may have been perfectly wholesome, and it may have been something else that developed indigestion in the stomach,—isn't that true? A. It might be possible. Q. If he had eaten other food that was improper, or unwholesome, that would prevent digestion of the oranges? A. It would set up some disturbance. All I can say is that this man died of the disease known as acute indigestion, or gastritis. That might be caused by a number of things, and a great many things. Q. You don't know, for the life of you, what caused it in this case, do you? A. Well, I have my reasons for thinking I know what caused it. Q. You think the failure of the oranges to digest caused it? A. Well, you see, where you get oranges, pieces in it like that, you might have frozen oranges. I couldn't say what caused these oranges to fail to properly digest. The condition of the stomach might have caused it, but it wouldn't cause the terrible odor in the bowels. It might cause acute indigestion. The odor was simply the effect of a condition peculiar to indigestion. His death was due to acute gastritis. The probable cause, in my opinion, of the condition was the oranges. If a man was perfectly healthy before he ate the oranges, you would look for something in the oranges that was wrong that caused the acute gastritis. Occasionally, you might find gastritis in a perfectly healthy man, but you would probably not, unless there was some unwholesome condition in the food."

He was asked this question, on recross-examination:

"A perfectly healthy man who ate wholesome food might have gastritis? A. Yes, sir. Cholera morbus from eating apples is a very frequent occurrence, and this is what this man had, in a general way."

Redirect examination: "You don't frequently find cholera morbus from eating perfectly wholesome and ripe apples, not infected in any way? A. If they were per-

fectly all right, you wouldn't find that they would. You would not expect that. That is my experience."

The jury could find, therefore, from this record that some of the oranges from which deceased selected the oranges that he ate were spotted and specked, had green spots, and that some of the oranges tasted bitter. Whether plaintiff selected for his own consumption the spotted and specked oranges, does not appear. It does appear, however, from his own statements that the oranges that he ate were not bitter, as were the oranges given his brother-in-law; for the brother-in-law testifies that, in the evening, he told deceased that he hadn't eaten the oranges that were handed him; that he threw them away, because he found them bitter to the taste. The deceased replied that the oranges that he ate tasted all right. The record presents this situation: The deceased had before him, when he selected the three oranges which he ate, a quantity of oranges, some of which were specked and spotted, and some of which tasted bitter. He selected from the quantity of oranges before him three, and ate them. His selection was made with knowledge of the fact that some of the oranges were marketable and some of them were not; that some had green spots and specks, and some had not. There was nothing accidental about the selection. It was open to him to make choice from the oranges before him, and he made his selection with the knowledge of the then condition of the oranges. His choice between the good and the affected oranges was voluntary. If he chose the good oranges and ate them, and they failed to digest, and gastritis resulted, it cannot be said that the means which caused acute gastritis were accidental. If he voluntarily chose to eat affected oranges, and they failed to digest, it cannot be said that the means that caused the gastritis were accidental. The consequences that followed the eating might not have been anticipated or intentional, but the thing done was inten-

tionally done. If the jury could have found from this record that the deceased voluntarily selected, from the oranges before him, affected oranges, and ate them, knowing that they were affected, and they produced the ill consequences that followed the eating, it must find that he ate, then, what he intended to eat, but misjudged the effect. If we say that he ate affected oranges, we must also say that they were selected for consumption voluntarily and intentionally; for this is the only inference to be drawn from the record. It cannot be said that either the selection or the consumption was accidental. The consequences that followed may not have been foreseen, and probably were not foreseen. So, if we should say that the jury might assume that he selected affected oranges and ate them, and they failed to digest, and gastritis set in, the jury could simply say that the result was accidental, but not the means. The record fails to show that there was any deleterious substance in the oranges, hidden from the deceased, which, operating upon the system, produced the disease of which he died. He voluntarily ate the oranges, the oranges failed to digest, gastritis set in, and he died from that disease. The thing which caused the disease came into his system through his own volition, after an opportunity for an intelligent selection from the oranges before him of those which he would consume. The record shows that his choice was with a full knowledge of the character of the oranges which he was about to eat. We think this case comes within the rule laid down in *Carnes v. Iowa St. Trav. Men's Assn.*, supra, and is governed by that. Nothing was taken into his stomach which was not voluntarily taken. The effect of the thing voluntarily taken was what caused his death. The result was accidental, but not the means. The burden was on plaintiff to show that the means were accidental; that it came within the provisions of the policy, which provides:

"Blood poison and disease by an injury effected by *accidental means* shall be covered by this certificate whenever the blood poisoning is effected at the time of the accident, and as a part thereof, and whenever the *disease* is a result of a direct injury to the organ affected thereby."

As said before, the defendant died from gastritis, which is caused by the failure of food to properly digest in the stomach. To come within the policy, the injury to the stomach must be traceable to means which were purely accidental, and the disease must be a result of a direct injury to the organ affected thereby, through accidental means. If we were to hold in this case that the plaintiff could recover, then, under a policy containing provisions such as this policy contains, it would follow that, whenever anyone ate food that disagreed with him, or which failed to properly digest, and acute indigestion followed, his beneficiary would be entitled to recover the amount of premium provided in the certificate. This case is clearly distinguishable from those cases in which the company was held liable where one ate food containing ptomaine poison, without knowledge of the fact that it contained ptomaine poison, and death resulted, not from the failure of the food to digest, but from the effect of the poison.

Upon the whole record, we feel that the plaintiff has shown no ground for recovery, and the judgment of the district court must be, and is,—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.