MARY GOHLKE, Appellant, v. HAWKEYE COMMERCIAL MEN'S
ASSOCIATION, Appellee.

**INSURANCE:** Accident Insurance—Intentional Act as Accidental
1 **Means.** An intentional act, not *per se* dangerous, and not intended
or expected to be attended with injurious results to the actor, may,
by some unforeseen, unexpected, or unusual contingency, become the
accidental means of injury to the actor, within the meaning of a
policy covering injury ''through external, violent, or accidental
means.'' So held where the taking of sal hepatica caused the fatal
closing of the glottis.

**INSURANCE:** Accident Insurance—Taking Poisonous Substance—
2 **Construction.** The provision of an accident policy exempting the
insurer from liability for injury resulting from the taking of
''poison, poisonous substances, gases, or *anything* intentionally * * *
taken, administered * * * or inhaled,'' does not exempt the insurer
from liability for death resulting from the taking of a *nonpoisonous*
harmless remedy which unexpectedly caused a fatal closing of the
glottis.

*Appeal from Marshall District Court.*—B. F. CUMMINGS, Judge.

April 1, 1924.

Rehearing Denied June 28, 1924.

Action in equity, to require defendant to make an assessment upon its members to pay the indemnity due plaintiff, as beneficiary under a certificate of membership issued to one who came to his death by accidental means. From a judgment dismissing the petition, plaintiff appeals.—*Reversed*.

*C. H. E. Boardman*, for appellant.

*F. E. Northup* and *R. E. Johnson*, for appellee.

Vermilion, J.—The plaintiff is the beneficiary named in a certificate of membership issued by the defendant association to Oscar Gohlke, deceased, some years prior to his death. The by-laws of the association provide in part as follows:

1. Insurance: accident insurance: intentional act as accidental means. "That, whenever a member in good standing, shall, through external, violent or accidental means, receive bodily injuries which shall, independently of all other causes, result in death within ninety days from said accident, the beneficiary named in his application for membership, or his heirs, if no beneficiary is named therein, shall be paid within ninety days after the receipt by the association, of proof satisfactory to the board of directors of said injuries and the accidental cause thereof the proceeds of one assessment of two dollars upon each member in good standing, but in no case shall such payment exceed the sum of five thousand dollars."

Oscar Gohlke died under circumstances to be hereafter stated, and plaintiff brings this action in equity to require the association to make an assessment, as provided for in the by-laws, to meet the obligation alleged to have arisen under and by virtue of the certificate of membership and the by-laws, by reason of his accidental death. The lower court denied the relief, and plaintiff appeals.

Two questions are presented: (1) Whether the death of

Oscar Gohlke resulted from injuries received through accidental means; and (2), if his death resulted from accident, whether it was one for which the beneficiary is, under the by-laws, entitled to recover.

Many of the principal facts are not in serious dispute. Oscar Gohlke died in his room at a hotel in Oklahoma City, on the morning of February 24, 1919. He retired to his room in apparent good health, at about midnight. Shortly thereafter, he was found strangling, and died in a few minutes.

Dr. Ross testified that he was called by a bell boy, and found Gohlke sitting on a chair by the telephone in his night clothes, with his head dropped forward; that he lifted his head and asked him what was the matter; that Gohlke tried to talk, but could only mumble, and not speak a word plainly, and there was froth coming from his mouth and nostrils; that he, the doctor, obtained help and put him on the bed, and in two minutes he was dead; that he was strangling, and could not talk or get his breath; that he (the doctor) gave him a strychnine hypodermic; but that he was then dying, and did not live to exceed five minutes after the doctor was called. He further testified that there was an open bottle of sal hepatica, a teaspoon with some of the dry powder on it, and a glass with a couple of ounces of water in it, on the table, and that no other medicine was found.

McCarthy, a guest at the hotel, occupying an adjoining room, testified that he heard the doctor call for help, and rushed to his assistance; that he found Gohlke in a chair in his night clothes, strangling and choking, with foam coming from his mouth and nostrils, and the doctor trying to get him to talk; that Gohlke never spoke, and was in a dying condition; that they lifted him on the bed, the doctor gave him a hypodermic, and he died immediately; that, on a table where Gohlke was sitting at the time of the entrance of the witness, there was a bottle partially filled with sal hepatica, a spoon with dry powder on it, and a glass with about two inches of water in it.

Torbert, a witness for the defendant, occupied a room across the hall from Gohlke's. He testified that, about 12 o'clock at night, he heard Gohlke joking with the bell boy; that all at once he heard him say, ''Get me a doctor quick,'' and then he

said, "Doctor, you had better hurry, I am going;" that there was no one in the room, because he heard the bell boy leave; that in a couple of minutes he heard footsteps, looked out, and went into the room; that Gohlke, dressed in his nightgown, was lying on the bed dead; that McCarthy and another man were there, but not the doctor; that the latter came in, felt of Gohlke's pulse, and said, "It is too late, he is dead;" that the doctor may have been in the room before, and come back. This is all of the testimony as to the occurrence of Gohlke's death.

On May 1st following, the body was exhumed, and an autopsy held. The brain and other organs of the body were found to be normal, and with no evidence of disease except some slight kidney trouble, the presence of gallstones, an enlarged heart, some hardening of the arteries, and a complete closure of the glottis, or opening from the pharynx into the larynx, or windpipe.

There is no claim that the condition of the kidneys or the gallstones caused the death. No immediate cause of death was found except the closing of the glottis, resulting in strangulation. The question of fact thus presented is: What caused the closing of the glottis and resulting strangulation and death?

The evidence shows that sal hepatica is a well known and commonly used remedy, and is not poisonous. It is an effervescent salt, and gives off a gas when it comes in contact with fluid.

Gohlke was 49 years old at the time of his death, was 5 feet, 6 or 8 inches tall, with a girth measure of about 57 inches, and weighed some 250 pounds. Notwithstanding his obesity, he is shown to have been active, to have bowled and walked with no apparent shortness of breath. In the seven years preceding his death, he required the services of a physician but once, for a few days, on account of digestive trouble. He was accustomed to take sal hepatica, and had once strangled when taking it.

It is the claim of plaintiff that, immediately before his death, deceased had taken a dose of sal hepatica, and that it, or the gas thrown off by its coming in contact with the mucous membranes of the throat, produced such irritation that the glottis closed, and he died of strangulation. On behalf of the

defendant, it is contended that the closing of the glottis was the result of an œdema, or swelling, caused by high blood pressure and disease of the heart.

As is not infrequently the case, there was considerable difference of opinion among the medical experts who testified as to the cause of death. Dr. Ross, who was present when Gohlke died, testified that in his opinion death was caused by strangling from taking a dose of effervescent salts. Dr. Hall, a medical graduate, engaged in laboratory work, who had specialized in post-mortem examinations for twenty years, was present at the autopsy. He testified on behalf of plaintiff that there was nothing about the heart that would indicate the cause of death; that it was large, and the wall somewhat thickened, but not grossly so; and that it was not abnormal for a man of that size and weight; that the glottis was so tightly closed that light was not admitted through the opening; that this indicated that the cause of death was by a spasm and swelling of the mucous membranes of the larynx, that choked the man to death; that there was nothing else found that indicated any cause of death except strangulation; that the witness had never heard of high blood pressure's causing a thickened and closed condition of the larynx such as would result in strangulation; that the closed condition of the larynx could be caused by some powerful irritants, or by œdema, swelling, in the lining of the larynx; that acute œdema could be caused by an irritant like sal hepatica, taken dry, and coming in contact with the mucous lining of the trachea; that the only cause of death he discovered at the autopsy was the irritated and closed condition of the throat; that a post-mortem tells nothing about high blood pressure, except by inference; that they examined the brain to see if apoplexy had occurred, and there was nothing to so indicate; that the circulatory system presented little evidence of the dangers they had anticipated; that there was some evidence of a sclerotic condition of the aorta, but not enough to explain death. He further testified that, if sal hepatica went down the wrong way, it might cause an irritation that would result in death,—like any foreign substance, like a piece of beefsteak or a fishbone that

would get in the windpipe; and that the post-mortem examina-. tion convinced him that death was so caused.

Dr. Magee, a specialist in diseases of the nose and throat, was present at the autopsy, and was called by the plaintiff. He testified that the heart was considerably enlarged, but, outside of its size, looked normal, as did its muscular structure; that, when the closed glottis was found, having in mind what had been found as to the rest of the body, it surely indicated the cause of death; that some substance had entered the larynx and produced an œdema, and, following the œdema, it closed, causing death; that the autopsy disclosed no other cause of sudden death; that sal hepatica inspired into the glottis might cause a swelling sufficient, if persisted in, to cause death; that death could be caused by sal hepatica, taken in dry form, irritating the glottis, and perhaps being drawn into the lungs and stomach, and that this would account for death; that this salt as it struck the mucous membrane would form a gas, which would be irritating; that œdema of the glottis, without reference to any external or irritating cause, was known to medical science, and that it was fatal; that at the autopsy there was found considerable hypertrophy of the heart; and that he did not think there was a direct connection between œdema of the larynx and hypertrophy of the heart; that œdema that came on from disease would be a gradual, progressive thing. This witness also testified that he had known Gohlke prior to his death; that he was very active, enjoyed reasonable health, and worked most of the time; and that there was no indication of high blood pressure or heart trouble.

Dr. Le Count, a physician and pathologist, with thirty years' experience in making post-mortem examinations, who made the examination at the autopsy, testified, for defendant, to finding the general conditions much as described by Dr. Hall, except that he said the heart was twice the normal size, and that evidences of circulatory trouble were found. He testified that, because of the size of the heart and the amount of muscle, he had no doubt that high blood pressure had been present; that œdema of the larynx is found where there is hypertrophy, or enlargement of the heart, where something is wrong with the

heart, and under other conditions; that, when people strangle, they cannot talk very much, cannot utter words, and talk loud, and articulate. He testified that, in his opinion, death was caused by heart disease, and that the immediate cause was the shutting off of air from the lungs; that death came from strangulation produced somehow; that they found no other cause than heart trouble; that Gohlke had had it for some time; that it would come on gradually,—probably several years; that there would be difficulty of breathing, and the man would know it in violent exercise; that the heart muscle was good, and the arteries of the heart were not hardened; that swelling of the glottis caused by failure of the heart to act would come on gradually, and it would not be likely that a man would be choking and in the next two or three minutes dead from anything like that.

Dr. Merrill, a medical examiner for the defendant, testified, in answer to a hypothetical question, that the man died of angina pectoris; that he did not think it probable, or barely possible, that death resulted from strangulation by taking sal hepatica dry or in solution. Asked if the œdema had any relation to hypertrophy of the heart or high blood pressure, he testified that œdema was a symptom encountered in heart failure, but that here it would seem so sudden that he would not know how to account for the œdema. He testified that a man could not talk if he were strangling; that his talking is an important element; that, when anything gets into the glottis, the first action of the muscles is to close it, then the muscle opens, and you seek to eject the foreign substance, then there may be another spasm that will close it, and if it is a permanent swelling, it will stay closed; that he never heard of a man's dying of closure of the glottis caused by heart trouble; that it would seem that, if a man had high blood pressure and a condition of the heart that caused œdema of the glottis and subsequent strangulation, it would take a much longer time than some substance in the glottis, causing irritation; that, if œdema of the glottis was caused by high blood pressure, the man would have been ill for some time.

Dr. Chesire, in answer to a hypothetical question propounded by defendant, said that death was due to heart failure,

superinduced by asphyxia; that the œdemic condition that closed the trachea was due to the condition of the heart; that he would not think it reasonably possible that death was caused by taking sal hepatica; that œdema of the larynx exists without the agency of an external irritant inspired into the larynx, and has relation to hypertrophy of the heart. On cross-examination, he testified that everyone dies of heart failure; that it was asphyxiation that stopped the heart; that, if the glottis is closed, a man dies of asphyxiation; that the primary cause of death was without doubt the closed glottis; that he died of œdema.

Dr. Hanson, upon a hypothetical question, said that death was probably due to some heart condition; that he attached significance to the fact that the heart was enlarged. He testified that the sclerotic condition of the aorta indicated high blood pressure; that œdema of the larynx might produce death; that it was not possible for the man to choke to death from taking sal hepatica; that, if he had attempted to take it, there would have been audible coughing; that it would not have been possible for him to have talked audibly while in the act of choking. On cross-examination, he testified that the man died of heart failure, and that most people died of that; that the heart failure was caused by asphyxiation; that the closed glottis indicated that this was the immediate cause of death; that œdema of the glottis caused by high blood pressure is a gradual process, indicated by marked discomfort of the patient and marked shortness of breath.

While the evidence is wholly circumstantial, we think it is fairly established that the deceased had taken a dose of dry sal hepatica a few minutes prior to his death. Every fact established tends to so show, and not a circumstance appears that indicates anything to the contrary, unless it be the testimony of the witness Torbert, to the effect that he heard Gohlke talking, while some of the doctors testified that one choking under such circumstances could not talk. Torbert's testimony is contradicted in many respects by that of the two other witnesses who were present. It is plain, also, that the ability of one to talk when in such situation must depend upon the conditions at the

instant the effort is made, and might exist at times between the first paroxysm and complete strangulation. If Torbert's testimony can be reconciled at all with that of the other witnesses, it must be upon the theory that what he heard was before the arrival of Dr. Ross; and it is certain that the deceased must have been able to, and did, in some manner, call assistance, although, when the doctor arrived, he could not talk.

We are of the opinion also that it is established by a fair preponderance of the evidence that the closing of the glottis which brought about the strangulation of deceased was caused by the presence of a foreign substance in the trachea, and not by disease. The overwhelming weight of the medical testimony is to the effect that œdema of the larynx or glottis, if produced by disease, would be gradual and progressive, and accompanied by symptoms of a positive character and easily observable. The absence of such symptoms is affirmatively established, and it is clearly shown that the choking of deceased was very sudden and violent, and such as would be produced by the presence of an irritant of the character claimed. Not only is it established that the deceased during life exhibited no evidences of disease calculated to bring about the fatal result, but the weight of the evidence as to the conditions disclosed at the autopsy supports the conclusion that no such disease existed.

It is urged that, although it be found that the deceased came to his death by strangulation after taking sal hepatica, yet that is not a death by such external and accidental means as, under the provision of the by-laws above quoted, will entitle the beneficiary to recover. This is a subject that has been much discussed by the courts, and this court has repeatedly announced the rule, which is found well expressed in *Rowe v. United C. T. Assn.*, 186 Iowa 454, as follows:

"That an intentional act, not *per se* dangerous, and not intended or expected to be attended with injurious results to the actor, may, by some unforeseen, unexpected, or unusual contingency, become the accidental means of injury to the actor, is too clearly demonstrated by common observation, by common experience, and by innumerable precedents, to justify argument."

See, also, the authorities there cited, and especially the discussion in *Lickleider v. Iowa S. T. M. Assn.*, 184 Iowa 423, and *Budde v. National Trav. Ben. Assn.*, 184 Iowa 1219.

Where death resulted from an injury caused by swallowing some substance, it has been held to have been caused by violent, external, and accidental means. *Jenkins v. Hawkeye C. M. Assn.*, 147 Iowa 113; *Maryland Cas. Co. v. Hudgins*, (Tex. Civ. App.) 72 S. W. 1047. In *American Acc. Co. v. Reigart*, 94 Ky. 547 (23 S. W. 191, 21 L. R. A. 651), the deceased was attempting to swallow a piece of beefsteak; it passed into the windpipe, and he choked to death. This was held to be a violent, external, and accidental means. It has been so held of the accidental inhaling of gas, causing asphyxiation. *Fehrer v. Midland Cas. Co.*, 179 Wis. 431 (190 N. W. 910); *Paul v. Travelers' Ins. Co.*, 112 N. Y. 472 (20 N. E. 347).

The voluntary taking of a nonpoisonous, harmless remedy, even though taken in a manner to produce, by effervescence, a gas that would be irritating, but which was not expected or intended to produce injurious results, would, we think, where such a result unexpectedly follows, be, under the rule announced, a violent, external, and accidental means.

It has been held that, where death is shown to have resulted from an external and visible injury, a presumption will obtain that it was not intentionally inflicted by the insured or by another. *Caldwell v. Iowa S. T. M. Assn.*, 156 Iowa 327; *Allen v. Travelers Prot. Assn.*, 163 Iowa 217. While the analogy is not exact, the principle is applicable, at least so far as respects the intention of the assured in taking the remedy.

It is provided by the by-laws of the defendant in part as follows:

"* * * nor shall this association be liable in any manner to any member or beneficiary for any indemnity for accidental death * * * resulting wholly or partially, directly or indirectly, from any of the following causes, conditions, or acts, or when the member is under the influence of or affected by any such causes, conditions, or act, to wit * * * nor from poison, poison ivy, poisonous substances, gases, or anything intentionally or

2. INSURANCE: accident insurance: taking poisonous substance: construction.

unintentionally, consciously. or unconsciously, accidentally or otherwise taken, administered * * * or inhaled.''

It is insisted, and rightly we think, that ·this by-law is not binding upon the plaintiff, because not in operation at the time the contract of insurance was entered into. *Olson v. Modern Woodmen,* 182 Iowa 1018; *Johnson v. Home Mut. Ins. Assn.,* 191 Iowa 535.

But, aside from that consideration, it could not have the effect to deprive the beneficiary of a right of recovery where the taking of a nonpoisonous substance was the accidental means of injury and death. Under the rule *ejusdem generis,* where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class of those enumerated. *State v. Campbell,* 76 Iowa 122; *State v. Eno,* 131 Iowa 619; *Brown v. Bell Co.,* 146 Iowa 89; *State v. Wignall,* 150 Iowa 650; *State v. Gardner,* 174 Iowa 748; 19 Corpus Juris 1255.

In the provision quoted, to the effect that the association shall not be liable for an injury or death from poison, poisonous substances, gases, or anything taken, the expression ''or anything'' must be construed to mean only a thing of the same general class as those enumerated,—that is to say, of a poisonous character. So construed, it would clearly not be applicable to or include a general and commonly used remedy, the use of which would not ordinarily be dangerous.

We reach the conclusion that the plaintiff is entitled to the relief asked, and the case is, therefore,—*Reversed.*

ARTHUR, C. J., STEVENS and DE GRAFF, JJ., concur.