ETTA V. CALKINS, Appellee, v. NATIONAL TRAVELERS BENEFIT
ASSOCIATION OF DES MOINES, Appellant.

**INSURANCE:** Accident Insurance—Voluntary Drinking of Liquors.
The *voluntary* drinking of *known* intoxicating liquors is not con-
verted into an "accident," within the meaning of an ordinary ac-
cident insurance policy, by evidence tending to show that, when the
drink was attempted, the hand of the insured "slipped," and he
drank more than he *intended* to drink, when the evidence furnishes
no basis whatever on which the jury could find that the insured
died *solely* from the quantity accidentally drunk.

**Headnote 1:** 1 C. J. p. 505.

*Appeal from Clarke District Court.*—A. R. MAXWELL, Judge.

JUNE 25, 1925.

ACTION upon an accident policy. Verdict and judgment for
plaintiff. Defendant appeals.—*Reversed.*

*Stipp, Perry, Bannister & Starzinger,* for appellant.

*Slaymaker & Killmer,* for appellee.

STEVENS, J.—This is an action in the name of the legal
beneficiary, upon an accident policy, to recover the amount al-
lowed thereby for the death of the insured in the event that
death resulted "directly, independently, and exclusively of any
and all other causes from bodily injuries effected solely through
accidental means." The petition is in the usual form, and the
defense relied upon is the general issue.

Raymond Calkins, the insured, is described as a man about
34 years of age, a veterinarian, practicing his profession in
Clarke County, a man of education, possessing a knowledge of
chemistry and considerable native ability. His death occurred
sometime during the night of May 16, 1922, and was the result,
directly or indirectly, of the use of alcoholic beverages.

It appears that sometime, perhaps prior to noon, on May

16th, the insured began to show the effects of intoxicants, and, upon returning to his home shortly after 7 o'clock in the evening, was suffering from violent pains in his head and stomach. A physician, who was a witness upon the trial, arrived about 8 o'clock. He testified that the patient was suffering from the effect of bad whisky, which contained an excessive quantity of fusel oil, and that he administered a small dose of atrophine hypodermically. He neither gave nor prescribed other medicine. Deceased became quiet as the result of the hypodermic, and the doctor went away. His wife testified that he complained, later in the evening, of pain in his stomach, and requested her to place her hand or head thereon. After she did so, he said he felt easier. She left him, to look after the children, and returned to his room, where she fell asleep on the bed, and awakened about midnight. Her husband was then, apparently, sleeping. She discovered early the following morning that he had died during the night. The physician who attended him testified upon the trial that his death was due to the poison contained in the liquor drunk by him. He further testified that the odor of "hooch," or fusel oil, was very strong upon his breath. The cause of death stated by him in the death certificate was: "Uncertain. Following acute gastritis evening before,"—and that contributory causes were "heart disease and lungs." The certificate of the witness attached to the proofs of loss gave the cause of death as poison. Both the physician and appellee, who is the surviving wife of deceased, testified that, on the night on which his death occurred, he was pale, and somewhat wild in his actions, and that his eyes were glassy and staring; that he suffered intensely; and that his feet and hands were cold. The insured had been, for a considerable time, habitually addicted to the use of intoxicating liquor. His wife testified that he was brought home on the afternoon of May 9, 1922, in an intoxicated condition; that his eyes were closed; that he was limp and helpless. On that occasion, he complained of pain in his stomach and head. She further testified that the appearance of his eyes and face was different from what she had previously seen, although she had on several occasions seen him when he was intoxicated. On or about May 11th, appellee went with him to visit her sister at Des Moines, where they

remained until the 16th. She testified that during that period he ate little and slept a great deal, and that his demeanor was somewhat unusual.

The incident and the evidence relied upon to prove that death was caused by accidental means are as follows:

H. G. Stubblefield testified:

"I drove up in front of the livery barn, and left my car standing in front of the barn; and it was right at 7 o'clock,— it was right close to that,—it was not five minutes off either way; and I went into his office, and he was in there; and I asked him about the serum, and he told me just what I have told you,—that he hadn't been to the.express office to get it yet, and he would call me later on. I started on out, and he said, 'Wait a minute,—I have got something here I want you to try;' and he went in his back room, and he came out of the back room with a gallon jug with some stuff in it,—I would say a quarter of an inch in the bottom of the jug,—and he says, 'I want you to taste that;' and I took the jug and put it up to my lips and tasted it; and it was awful hot,—just like you would put gasoline in your mouth. Q. How much, if any, of it did you drink? A. I never really drank any of it. I never let any of it get down my throat. I just got it in my mouth,— just tasted it. I don't suppose I got over a teaspoonful in my mouth. Q. What did you do with it? A. I handed the jug back to him, and it made the tears come in my eyes; and after I handed the jug back, I turned around, and I heard him cough after I turned around; and I turned to look at him, and he was strangling, as though he had taken a drink· out of it; and he went on coughing like you do when you are strangling; and I says, 'What is the matter, Doc?' and he said, 'Well, my hand slipped, and I got lots more of that stuff than I aimed to;' and I don't remember whether there was anything else said or not; but, at any rate, he set the jug down on the floor of his back room."

Later, a bottle containing about one-half ounce of the liquor was taken to the physician who attended deceased, for examination. No chemical analysis was made of it. The physician testified, however, that it had the odor of, and in his opinion was largely, fusel oil. Fusel oil is defined as a volatile oily liquid

obtained in the rectification of spirituous liquors made from the fermentation of grain, potatoes, the marc of grapes, and other material. Its chief constituent, amyl alcohol, is described as a direct nerve poison. According to the testimony, fusel oil has a tendency to settle to the bottom of a vessel containing "hooch" manufactured from grain and potatoes.

"Accident" and "accidental means" have been so often defined by this court as to forbid any further attempt to do so. *Carnes v. Iowa St. Trav. Men's Assn.,* 106 Iowa 281; *Rowe v. United Com. Trav. Assn.,* 186 Iowa 454; *Lehman v. Great W. Acc. Assn.,* 155 Iowa 737; *Lickleider v. Iowa St. Trav. Men's Assn.,* 184 Iowa 423; *Budde v. National Trav. Ben. Assn.,* 184 Iowa 1219; *Hanley v. Fidelity & Cas. Co.,* 180 Iowa 805; *Gohlke v. Hawkeye Com. Men's Assn.,* 198 Iowa 144.

The vital and controlling question in this case is: Did the death of the insured result, directly, independently, and exclusively of any and all other causes, from bodily injuries effected solely through accidental means, within the light of our previous decisions?

The record, as we have already indicated, shows that deceased was, and had long been, a hard drinker. Perhaps his habit in this respect was somewhat irregular, but there can be no doubt that his power of resistance was considerably reduced by the excessive use of alcohol. This alone will not, however, defeat recovery, if his death is traceable directly to accidental means. The jug containing the liquor was a new one, and insured must have known the nature of the liquor contained therein, as well as its effect when taken internally. His act in placing the jug to his lips for the purpose of imbibing the liquor was wholly voluntary. His wife observed that he had been drinking about noon, and again when he came home to dinner, shortly before 6 o'clock. The witness who was present at the office did not see insured's hand slip, nor is there other evidence thereof than his own statement to that effect. It is not easy to conceive how he could have obtained an appreciably larger quantity of liquor because his hand slipped, than he would have taken while drinking freely from the jug. The tendency of his hand's slipping would have been to break the connection, rather than to precipitate a larger quantity of the

liquid into his stomach. If the liquor produced coughing or strangulation, the effect would have been to expel, rather than to increase the quantity taken. It is not sufficient if the proof merely showed that the accident caused a larger quantity of the liquor to be taken into the stomach than was intended by deceased. Death must have resulted, directly, independently, and exclusively of all other causes, from accidental means; and the burden rested upon appellee to make a prima-facie showing to that effect. There is absolutely no fact or circumstance in the record from which it was possible for the jury to determine whether the excess quantity of the beverage, if any, precipitated into the mouth of the insured, was the cause of death, or sufficient for that purpose. The jury could not, from anything appearing in the record, distinguish between the effect of the liquor taken voluntarily and intentionally, and the effect of the excess resulting from the accident. Evidence on this point opened only a field for the speculation or conjecture of the jury. If death resulted from the effect of the liquor voluntarily taken, then clearly no recovery could be had. The facts of this case readily distinguish it from many other cases to be found in the decisions of this and other courts in which recovery has been upheld.

Recovery was denied in *Carnes v. Iowa St. Trav. Men's Assn.*, supra, because it was impossible for the jury to determine from the evidence whether the insured, who took a quantity of morphine sufficient to produce death, took it purposely, but misjudged its effect, or whether the same was taken inadvertently or by mistake. The morphine tablets were prescribed as a medicine, and were not taken as a beverage. The precise effect of a proper dose could be readily determined.

In *Martin v. Interstate B. M. A. Assn.*, 187 Iowa 869, we held that the death of the insured, which was caused by acute indigestion following food voluntarily selected and eaten with full knowledge of its character, was not the result of accidental means. The insured in *Gohlke v. Hawkeye Com. Men's Assn.*, supra, died of strangulation produced by taking dry sal hepatica into his mouth; and consequently we held that death was traceable directly to accidental means. Among other cases of a similar nature, the following will be found typical: *United States*

*Fid. & Guar. Co. v. Hood,* 124 Miss. 548 (87 So. 115); *Christ v. Pacific Mut. Life Ins. Co.,* 312 Ill. 525 (144 N. E. 161).

In this case there is nothing whatever tending even remotely to prove what portion of the beverage was imbibed voluntarily and intentionally, nor whether death resulted therefrom or from the excess claimed to have been taken as the result of the alleged accident. In the absence of some evidence on this point, there was nothing for the jury to pass upon. It may be that the quantity of the liquid taken out of the jug could approximately be ascertained; but the evidence bearing on that point afforded the jury no means for determining the proportion that was voluntarily and intentionally drunk. There is the further fact that the insured had recently suffered from acute indigestion, as the result of drinking alcoholic beverages, and that he was already seriously affected by the liquor drunk earlier during the day. The physician evidently did not believe he was in a critical condition, or likely to die from the poisonous effect of fusel oil. In fact, he testified that he did not think the condition of the patient dangerous. No autopsy was held, and the cause of death is known only from the symptoms manifested at the time the physician last saw him, and knowledge of the effect of the beverage used.

It is our conclusion that no question of fact was presented for the jury to pass upon, and that the motion made by appellant at the close of the evidence for a directed verdict should have been sustained. This makes a discussion of the other rulings complained of unnecessary.

The judgment of the court below is—*Reversed.*

FAVILLE, C. J., and DE GRAFF and VERMILION, JJ., concur.