## ANNIE M. MEHAFFEY v. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY.

(Filed 10 January, 1934.)

**1. Insurance R a—Definition of "external, violent accidental means" as used in policy of health and accident insurance.**

In order to recover on a policy of accident insurance conditioned upon death or injury to insured resulting "solely through external, violent and accidental means" it is necessary for claimant to show not only accidental injury or death, but also that the injury or death was produced by "accidental means," which implies "means" producing a result which is not the natural and probable consequence of such means, and it is not sufficient for recovery if the injury or death, though unexpected, flows directly from an ordinary act in which the insured voluntarily engages, but the taking of poison inadvertently or through error is an accidental means within the meaning of the contract.

**2. Same—Evidence held insufficient to show that insured's death resulted from accidental means within meaning of policy of accident insurance.**

In an action on a policy of accident insurance providing for liability if insured should die as a result of external, violent and accidental means, expert testimony of plaintiff's witness that insured died from some poisonous substance taken internally is insufficient to overrule insurer's motion of nonsuit where all the evidence tends to show that insured had been drinking heavily and continuously sometime prior to his death, that on the morning of his death he drank some buttermilk and thereafter became sick and vomited and took some medicine given him by a pharmacist, and died shortly thereafter, without any evidence that the buttermilk or the whiskey insured had been drinking were poisonous or that the medicine was harmful, and that an autopsy showed his stomach contained blood and mucous and was inflamed, with expert testimony that such condition could have been caused by heavy drinking.

CLARKSON, J., dissenting.

CIVIL ACTION, before *Clement, J.,* at March Term, 1932, of HENDERSON.

On or about 1 July, 1930, the defendant executed and delivered to Mark L. Mehaffey a policy of life and accident insurance, covering certain employees of the Southern Railway Company and insuring against

"the effects resulting directly and exclusively of all other causes from bodily injury sustained by the insured, solely through external, violent and accidental means (excluding suicide or any attempt thereat, while sane or insane)," etc. Mark Mehaffey died 21 July, 1930.

A friend of the deceased, who was with him on the morning of his death, said: "I knew Mark L. Mehaffey. . . . We lived about two blocks from one another. I telephoned him that morning to come by my house and I got with him about 8:30. . . . We went to the station and he was in my car. . . . He asked me to go with him and eat breakfast. I told him I had had my breakfast. I went to the postoffice and he came to me after he ate his breakfast. He went to Mr. Cain's cafe for breakfast. . . . He walked from the depot to the cafe. It was about ten or fifteen minutes from the time I departed from him at the depot until I met him again. . . . I had come in off my run the day before and left my overalls at the shop. I wanted to get them and carry them to the laundry and he got in the car to go with me to get them. We had to go about one mile from the station to the shop. On the way to the shop I did not notice anything out of the ordinary except he got out of the car and vomited. . . . When I stopped the car he got out of the car and set down on the running board and vomited. . . . After he vomited he got back into the car and I went to the shop and got my overalls. . . . Then I went to Smith's Drug Store. He asked me to stop. . . . I went into the drug store with him and asked Dr. Stowe to give him some medicine and he gave him two doses. He was in the drug store about ten minutes. He seemed to feel better after taking the medicine. . . . I took him to the Mission Hospital. On my way from the drug store to the hospital he made a statement as to his physical condition. He told me if he did not get medical aid from somewhere he was going to die. About ten minutes after he reached the hospital he died."

The coroner testified that he saw the deceased thirty or forty minutes after his death and that he performed an autopsy on the body. He said: "His stomach was red, irritated, congested, and in an inflammatory condition. There was a large amount of black blood and mucous in the stomach." He further testified that heavy drinking would have probably had that effect on the stomach. "I think heavy drinking would have had a tendency to produce the kind of condition I found in his stomach. Drinking would be some substance taken into the stomach."

The keeper of the restaurant in which the deceased ate his breakfast, testified that the deceased drank only buttermilk on the morning of his death. There was no evidence that the buttermilk was deleterious or unwholesome. There was abundant evidence, however, that for some-

time prior to his death the deceased had been drinking heavily. A witness said that on the Sunday preceding his death "me and him was together most of the day, riding around. We were both drinking. We were both pretty much drunk." Another associate of deceased testified that on Monday evening before he died on Tuesday the deceased had had two small drinks "of as good a kind of liquor as is made at this time. . . . There is some pretty good liquor yet. He took one drink about eleven o'clock and another about six that afternoon." There was also evidence that on a fishing trip a few days before his death the deceased was under the influence of liquor. He was able to go about and go to bed by himself. The physician at the drug store where the deceased stopped a few minutes before his death, testified that "he appeared to be suffering from cramps in his stomach. I fixed him a dose of soda and pepsin. . . . The pepsin is absolutely harmless. While it may not have done good it could not have done any harm."

Dr. Millender, who was present at the time the autopsy was made by the coroner, testified: "The examination showed that the stomach contained blood. It showed that it contained what we assumed to be buttermilk or those two mixed together uniformly in a dark, purplish material. The stomach showed nothing very definite and striking. It was not very abnormal. It did not appear to have had any corrosive poisonous substance acting upon it. . . . No powerful agent would leave the stomach as unharmed as we found this one." There was no evidence that the deceased had been drinking on the morning of his death and there was no odor of whiskey upon his breath.

The coroner, who was a practicing physician, testified that from the post mortem examination he had an opinion satisfactory to himself as to the cause of the assured's death. Thereupon the court propounded the following question: "You can tell what he died from in your opinion?" and the witness replied: "He died from some poisonous substance taken internally."

The following issue was submitted to the jury: "Did the assured, Mark L. Mehaffey, die from effects resulting directly and exclusively of all other causes from bodily injuries sustained by him solely through external, violent and accidental means, as alleged in the complaint?"

The jury answered the issue "Yes," and upon the verdict judgment was rendered against the defendant for $2,000 indemnity provided in the policy, and the defendant appealed.

  *Redden & Redden and Shipman & Arledge for plaintiff.*
  *Zeb F. Curtis and John A. Chambliss for defendant.*

BROGDEN, J. Was the opinion of the coroner based upon the post mortem examination, that the assured died "from some poisonous sub-

MEHAFFEY *v*. INSURANCE CO.

stance taken internally" sufficient evidence to warrant recovery upon the policy and ward off a nonsuit?

The evidence discloses that for sometime prior to his death the deceased had been drinking heavily and continuously. There was no evidence that the deceased had taken a drink on the morning of his death, but he had been to a cafe and consumed a glass of buttermilk. All the evidence was to the effect that the buttermilk was wholesome. Shortly after drinking the buttermilk the deceased vomited and went to a drug store where a physician administered pepsin and soda. All the evidence was to the effect that the pepsin and soda were harmless. Thirty minutes thereafter the insured was dead.

The theory advanced by the plaintiff is that the deceased was poisoned either by the buttermilk or the liquor which he had been drinking. An examination of the evidence, however, discloses no evidence of poisoning except the statement of the coroner that in his opinion the insured died from some "poisonous substance taken internally."

The liability clause of the policy of insurance rested upon death or injury "solely through external, violent and accidental means." Therefore, in order to warrant recovery for death in such event, such death must not only be accidental but must be produced by "accidental means."

There is abundant authority for the proposition that death caused by inadvertent poisoning or by taking poison through mistake constitutes "accidental means" within the meaning of clauses similar to the one forming the basis of this suit. The law bearing upon the subject may be found in 13 A. L. R., 657; 14 A. L. R., 784; 41 A. L. R., 363; *Calkins v. National Travellers' Benefit Association,* 204 N. W., 406; *Christ v. Pacific Mutual Life Ins. Co.,* 144 N. E., 161; *Olinsky v. Railway Mail Asso.,* 189 Pac., 835; *Ætna Life Ins. Co. v. Brand,* 265 Fed., p. 6; *U. S. Mutual Accident Asso. v. Barry,* 131 U. S., 121, 33 L. Ed., 66. See, also, *Harris v. Ins. Co.,* 204 N. C., 385. The interpretation of the term "accidental means" is not uniform but in large measure the judicial variability arises from the dissimilarity of facts involved.

The interpretation given in the *Olinsky case, supra,* is as follows: "It may be treated as established by the great weight of authority that an injury is not produced by accidental means . . . where it is the direct, though unexpected, result of an ordinary act in which the insured intentionally engages." The *Barry case, supra,* states the principle in these words: "That, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

Upon consideration of these authorities and others of like import, it seems that "accidental means" implies "means" producing a result which is not the natural and the probable consequence of such means. If the result, although unexpected, flows directly from an ordinary act in which the insured voluntarily engages, then such is not deemed to have been produced by accidental means.

Applying the accepted principles of law to the facts, it does not appear that the deceased took poison by mistake or through inadvertence. Assuming that there was evidence of poison in his stomach after death, there is no evidence that it got there through accidental means. Indeed, the facts and circumstances disclose without equivocation that any poison in the stomach of deceased was the natural and probable consequence of an ordinary act in which he voluntarily engaged. Hence no recovery can be sustained and the motion for nonsuit should have been allowed.

Error.

CLARKSON, J., dissenting: The complaint alleges that the assured, Mark L. Mehaffey, on 22 July, 1930, and while the policy sued on was in full force and effect, died from effects resulting directly and exclusively of all other causes, from bodily injuries sustained by the insured solely through external, violent and accidental means, to wit: "By the accidental drinking of poisonous fluid or liquids which caused him to be continually disabled, and which resulted fatally within a few hours thereafter." The plaintiff offered in support of this allegation the evidence of P. E. Smith, who was with him on the morning of his death: Mehaffey went to McCain's Cafe for breakfast, he walked from the depot to the cafe. It was about 10 or 15 minutes before Smith entered, and took him to the hospital where he died about ten minutes later. The evidence of this witness was to the effect that the deceased took a spell of vomiting which lasted about ten minutes. Smith then at the request of the deceased took him to Smith's Drug Store in Asheville, where he was given soda, pepsin, and then ammonia. Smith started home with him, and Mehaffey then told him that if he did not get some medical treatment somewhere he was going to die. He then took him to Mission Hospital, and while in the dispensary in the hospital, he stated to the witness that his hands were getting stiff and numb and that he could not see. Dr. W. E. Baker, who was found by the court to be a medical expert, and who was at the time the coroner of Buncombe County, testified that he saw the deceased some thirty or forty minutes after his death, had the body removed to Clayton and Hyer's and there performed an autopsy. The witness testified "The stomach was red, irritated, congested, and in an inflammatory condi-

23—205

tion. There was a large amount of black blood and mucous in the stomach. His heart was normal as to any examination as far as I could tell. Q. From your examination as a practicing physician and from the examination you made of his stomach and other organs you examined, have you an opinion satisfactory to yourself as to the cause of the assured's death? A. Yes. Q. What is your opinion? A. He *died from some poisonous substance taken internally.*" The witness testified further: *"I don't know that I know of any other cause or reason that would cause that condition of the stomach than the reasons I have just related.* Q. You mean what other would cause that condition? A. *I don't know of any other.* I think a microscopical examination of that condition I have just outlined would be a very much more thorough way of examining than the examination I made. I don't know that it would be very decidedly more determinative." This in substance is the evidence chiefly relied upon by the plaintiff to sustain the above quoted allegation of the complaint.

The judgment of the court below is as follows: "This cause coming on to be heard and being heard before the undersigned judge holding the courts of the Eighteenth Judicial District and a jury at the March Term, 1932, of Henderson County Superior Court, and the following issue having been submitted to a jury: 'Did the assured Mark L. Mehaffey die from effects resulting directly and exclusively of all other causes from bodily injuries sustained by him solely through external, violent and accidental means, as alleged in the complaint?' And the jury having answered the issue 'Yes' and it appearing from the policy sued on that upon the issue as answered by the jury, the plaintiff is entitled to judgment for the sum of $2,000 with interest from 10 February, 1931. It is, therefore, on motion of counsel for the plaintiff, ordered, adjudged and decreed that the plaintiff recover of the defendant the sum of $2,000 and interest on $2,000 from 10 February, 1931. It is further ordered that the defendant be taxed with the cost of this action."

It is the well settled rule of practice and accepted position in this jurisdiction, that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom. *Pearson v. Sales Co.,* 202 N. C., 20.

In *Denny v. Snow,* 199 N. C., at p. 774, we find: "A verdict or finding must rest upon facts proved, or at least upon facts of which there is substantial evidence, and cannot rest upon mere surmise, speculation, conjecture, or suspicion. There must be legal evidence of every material

fact necessary to support the verdict or finding, and such verdict or finding must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities. 23 C. J., pp. 51-52."

The only material question involved in this case is whether there was sufficient competent evidence, more than a scintilla of evidence to be submitted to a jury? I think so. The learned judge in the court below thought so and twelve jurors found the fact. The facts necessary to support a verdict can be shown by circumstantial as well as direct evidence. Plaintiff's husband, Mark L. Mehaffey was a locomotive fireman, employed by the Southern Railway Company. The action is brought by plaintiff, the beneficiary, in an insurance certificate issued "under the terms and conditions of Group Accidental and Health Policy No. 275 covering certain employees of the Southern Railway Company." The material clause is as follows: "Against (1) the effect resulting directly and exclusively of all other causes from bodily injuries sustained by the insured, solely through external, violent and accidental means (excluding suicide or any attempt thereat while sane or insane)," etc. There is no evidence on the record of suicide.

In Vol. 5, Couch Cyc. of Ins. Law, part sec. 1136, p. 3958, is the following: "A large number of cases also involve the clause, 'external, violent, and accidental means.' Under this provision the injury must be external, violent, and accidental, but the degree of violence is immaterial. An unnatural death, the result of accident of any kind, imports an external and violent agency as the cause within the meaning of an insurance policy limiting recovery to death caused through 'external, violent, and accidental means.' . . . (Part sec. 1141, at p. 4003.) There are also numerous cases of death or disability incident to the partaking of food or drink, and resulting either from poisoning or from disease. In the case of death or disability resulting from the mechanical action of food or drink, the cases are largely agreed that it was by accident or the result of accidental means. And the authorities agree that death directly from poisoning following the unintentional eating of bad, but apparently wholesome, food, is affected by accident, or is the result of accidental means, unless causes of such a character are expressly excepted."

In 14 R. C. L., part sec. 427, at p. 1249, we find: "It has been said that unnatural death, the result of accident of any kind, imports an external and violent agency as the cause within the meaning of an insurance policy limiting recovery to death caused through 'external, violent, and accidental means.'" *Zurich General Accident and Liability Ins. Co. v. Mrs. S. A. Flukenger,* 68 A. L. R., 161.

Dr. Charles W. Millender (a medical expert), a witness for defendant, on cross-examination, testified: "I was examined at the coroner's inquest. I made this statement: 'I can state to the jury what in my opinion is the cause of death. After the examination I have seen made and made myself, I arrived at the conclusion *that his death was attributable to a poisonous substance taken internally.* It must be understood that this is an opinion in light of the clinical evidence and the post mortem changes that I observed."

The court below gave an able and exhaustive charge on every aspect of the case and charged the law applicable to the facts. The contentions on both sides were fairly left to the jury. The outline is as follows: "The plaintiff contends that the deceased died from eating or drinking something that poisoned him, and that it was done accidentally. The defendant denies that, says that the deceased came to his death not by eating or drinking something that poisoned him, but by any sudden taking into his system of milk, or drink of liquor, poisonous food or any substance that poisoned or killed him, but that he died a natural death. The defendant contends that death was prematurely brought on because of the dissipations he underwent, because of the way he lived, and conducted himself, the amount of liquor he consumed over a period of time. The plaintiff says that you should find from the evidence that the assured met his death solely through external, violent and accidental means, that he drank or ate something and that that poisoned him and that he died from it within a short time. The defendant says that when you consider all the testimony, that you should not find that to be the case, but that you should find that he died prematurely, but that the death was brought on by the way he lived, that he was not poisoned that morning; that you should not find the buttermilk was poisoned; that you should not find that anything poisoned him that morning, but that you should find that for several days prior to his death he had been dissipating and that his system gradually gave way and was undermined by what he drank, and that the organs of his body failed to function and that he died; that you should not find that this was under the terms of the policy, solely through external, violent and accidental means."

I think there was sufficient competent evidence more than a scintilla to be submitted to the jury, the probative force was for them. This Court has only "jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference." Art. IV, sec. 8, Const. of N. C. I think the judgment of the court below should be upheld.