CLARKSON, J., dissenting.
On or about 1 July, 1930, the defendant executed and delivered to Mark L. Mehaffey a policy of life and accident insurance, covering certain employees of the Southern Railway Company and insuring against *Page 702 
"the effects resulting directly and exclusively of all other causes from bodily injury sustained by the insured, solely through external, violent and accidental means (excluding suicide or any attempt thereat, while sane or insane)," etc. Mark Mehaffey died 21 July, 1930.
A friend of the deceased, who was with him on the morning of his death, said: "I knew Mark L. Mehaffey. . . . We lived about two blocks from one another. I telephoned him that morning to come by my house and I got with him about 8:30. . . . We went to the station and he was in my car. . . . He asked me to go with him and eat breakfast. I told him I had had my breakfast. I went to the postoffice and he came to me after he ate his breakfast. He went to Mr. Cain's cafe for breakfast. . . . He walked from the depot to the cafe. It was about ten or fifteen minutes from the time I departed from him at the depot until I met him again. . . . I had come in off my run the day before and left my overalls at the shop. I wanted to get them and carry them to the laundry and he got in the car to go with me to get them. We had to go about one mile from the station to the shop. On the way to the shop I did not notice anything out of the ordinary except he got out of the car and vomited. . . . When I stopped the car he got out of the car and set down on the running board and vomited. . . . After he vomited he got back into the car and I went to the shop and got my overalls. . . . Then I went to Smith's Drug Store. He asked me to stop. . . . I went into the drug store with him and asked Dr. Stowe to give him some medicine and he gave him two doses. He was in the drug store about ten minutes. He seemed to feel better after taking the medicine. . . . I took him to the Mission Hospital. On my way from the drug store to the hospital he made a statement as to his physical condition. He told me if he did not get medical aid from somewhere he was going to die. About ten minutes after he reached the hospital he died."
The coroner testified that he saw the deceased thirty or forty minutes after his death and that he performed an autopsy on the body. He said: "His stomach was red, irritated, congested, and in an inflammatory condition. There was a large amount of black blood and mucous in the stomach." He further testified that heavy drinking would have probably had that effect on the stomach. "I think heavy drinking would have had a tendency to produce the kind of condition I found in his stomach. Drinking would be some substance taken into the stomach."
The keeper of the restaurant in which the deceased ate his breakfast, testified that the deceased drank only buttermilk on the morning of his death. There was no evidence that the buttermilk was deleterious or unwholesome. There was abundant evidence, however, that for sometime *Page 703 
prior to his death the deceased had been drinking heavily. A witness said that on the Sunday preceding his death "me and him was together most of the day, riding around. We were both drinking. We were both pretty much drunk." Another associate of deceased testified that on Monday evening before he died on Tuesday the deceased had had two small drinks "of as good a kind of liquor as is made at this time. . . . There is some pretty good liquor yet. He took one drink about eleven o'clock and another about six that afternoon." There was also evidence that on a fishing trip a few days before his death the deceased was under the influence of liquor. He was able to go about and go to bed by himself. The physician at the drug store where the deceased stopped a few minutes before his death, testified that "he appeared to be suffering from cramps in his stomach. I fixed him a dose of soda and pepsin. . . . The pepsin is absolutely harmless. While it may not have done good it could not have done any harm."
Dr. Millender, who was present at the time the autopsy was made by the coroner, testified: "The examination showed that the stomach contained blood. It showed that it contained what we assumed to be buttermilk or those two mixed together uniformly in a dark, purplish material. The stomach showed nothing very definite and striking. It was not very abnormal. It did not appear to have had any corrosive poisonous substance acting upon it. . . . No powerful agent would leave the stomach as unharmed as we found this one." There was no evidence that the deceased had been drinking on the morning of his death and there was no odor of whiskey upon his breath.
The coroner, who was a practicing physician, testified that from the post mortem examination he had an opinion satisfactory to himself as to the cause of the assured's death. Thereupon the court propounded the following question: "You can tell what he died from in your opinion?" and the witness replied: "He died from some poisonous substance taken internally."
The following issue was submitted to the jury: "Did the assured, Mark L. Mehaffey, die from effects resulting directly and exclusively of all other causes from bodily injuries sustained by him solely through external, violent and accidental means, as alleged in the complaint?"
The jury answered the issue "Yes," and upon the verdict judgment was rendered against the defendant for $2,000 indemnity provided in the policy, and the defendant appealed.
Was the opinion of the coroner based upon the post mortem examination, that the assured died "from some poisonous substance *Page 704 
taken internally" sufficient evidence to warrant recovery upon the policy and ward off a nonsuit?
The evidence discloses that for sometime prior to his death the deceased had been drinking heavily and continuously. There was no evidence that the deceased had taken a drink on the morning of his death, but he had been to a cafe and consumed a glass of buttermilk. All the evidence was to the effect that the buttermilk was wholesome. Shortly after drinking the buttermilk the deceased vomited and went to a drug store where a physician administered pepsin and soda. All the evidence was to the effect that the pepsin and soda were harmless. Thirty minutes thereafter the insured was dead.
The theory advanced by the plaintiff is that the deceased was poisoned either by the buttermilk or the liquor which he had been drinking. An examination of the evidence, however, discloses no evidence of poisoning except the statement of the coroner that in his opinion the insured died from some "poisonous substance taken internally."
The liability clause of the policy of insurance rested upon death or injury "solely through external, violent and accidental means." Therefore, in order to warrant recovery for death in such event, such death must not only be accidental but must be produced by "accidental means."
There is abundant authority for the proposition that death caused by inadvertent poisoning or by taking poison through mistake constitutes "accidental means" within the meaning of clauses similar to the one forming the basis of this suit. The law bearing upon the subject may be found in 13 A.L.R., 657; 14 A.L.R., 784; 41 A.L.R., 363; Calkins v. NationalTravellers' Benefit Association, 204 N.W. 406; Christ v. Pacific MutualLife Ins. Co., 144 N.E. 161; Olinsky v. Railway Mail Asso.,189 P. 835; Aetna Life Ins. Co. v. Brand, 265 Fed., p. 6; U.S. MutualAccident Asso. v. Barry, 131 U.S. 121, 33 L.Ed., 66. See, also,Harris v. Ins. Co., 204 N.C. 385. The interpretation of the term "accidental means" is not uniform but in large measure the judicial variability arises from the dissimilarity of facts involved.
The interpretation given in the Olinsky case, supra, is as follows: "It may be treated as established by the great weight of authority that an injury is not produced by accidental means . . . where it is the direct, though unexpected, result of an ordinary act in which the insured intentionally engages." The Barry case, supra, states the principle in these words: "That, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." *Page 705 
Upon consideration of these authorities and others of like import, it seems that "accidental means" implies "means" producing a result which is not the natural and the probable consequence of such means. If the result, although unexpected, flows directly from an ordinary act in which the insured voluntarily engages, then such is not deemed to have been produced by accidental means.
Applying the accepted principles of law to the facts, it does not appear that the deceased took poison by mistake or through inadvertence. Assuming that there was evidence of poison in his stomach after death, there is no evidence that it got there through accidental means. Indeed, the facts and circumstances disclose without equivocation that any poison in the stomach of deceased was the natural and probable consequence of an ordinary act in which he voluntarily engaged. Hence no recovery can be sustained and the motion for nonsuit should have been allowed.
Error.