NELL GLENN SCOTT v. ÆTNA LIFE INSURANCE COMPANY.

(Filed 10 April, 1935.)

**Insurance R a—Death resulting from embolus caused by infection from tooth extraction held accidental, but not caused by accidental means.**

Plaintiff's evidence tended to show that insured had a tooth extracted by a competent and skillful dentist, who performed the operation at the request of insured with proper and sterile instruments in the usual and ordinary manner, employing the requisite degree of care and skill, that thereafter infection set in which produced an embolus which caused the death of insured. Plaintiff's evidence was not conclusive that the embolus resulted from the extraction of the tooth. *Held:* The evidence was insufficient to show that insured died from an external, violent, and accidental means within the terms of the double indemnity clause of the policy sued on, for although insured's death was the result of an accident in that death from an embolus caused by infection is not the ordinary and expected result of a tooth extraction, yet such accidental death was not the result of accidental means, since the tooth extraction ultimately resulting in death was performed intentionally in a skillful and usual manner, without mishap or unforeseen element.

CLARKSON, J., dissents.

CIVIL ACTION, before *Sink, J.,* at October, 1933, Civil Term of GUILFORD.

On or about 26 April, 1921, the defendant delivered to Robert B. Scott two policies of life insurance, Nos. N-282880 and N-282881, each for the amount of $1,000. The plaintiff is the beneficiary named in said policies. Riders were on the policies providing double indemnity and reading as follows: "If the death of the insured occurs before the first anniversary date of this policy which follows the age of seventy years, and before a payment under the permanent total disability provision, if any, has been made or benefit thereunder allowed, all premiums previously due having been paid, and such death result directly and independently of all other causes from bodily injuries effected solely through external, violent, and accidental means within ninety days from the occurrence of such accident, and if such accident is evidenced by a visible contusion or wound on the exterior of the body (except in case of drowning and internal injuries revealed by an autopsy), and if such death does not result from suicide, while sane or insane, nor from military or naval service in time of war, nor from any aeronautic flight or submarine descent, nor directly or indirectly from disease in any form, then the company will pay a sum equal to the sum herein described as the sum insured in addition thereto."

On 25 April, 1931, the insured, Robert B. Scott, consulted Dr. Sheffield in Greensboro, North Carolina, who was a duly and regularly licensed dentist and was admitted to be an expert. Dr. Sheffield said at the trial: "I saw him on or about 25 April, 1931, at my office. . . . I extracted a tooth for him. It was a left lower, third molar, last tooth in the mouth. It was extracted about two o'clock in the afternoon. The treatment was as in the usual extraction. The first procedure was to sterilize the area around the tooth. . . . Washing off all debris and foreign particles in that area, followed by an application of tincture of iodine; an injection was made for an anæsthetic, and the tooth was extracted. Immediately following the extraction cotton rolls were placed on either side of the socket until a blood clot was formed in the socket. The date of the extraction was Saturday, 25 April. . . . I saw him on Monday following. . . . At that time I observed first a complete blood clot, no swelling, very little soreness, and no complaint from patient. He reported that he had had no trouble so far. I next saw him on Thursday morning, about two o'clock. . . . He called me . . . and told me he was having trouble, and asked me to tell him what to do. . . . At that time he was complaining of a swelling and soreness of the neck, and of course I gave him the treatment, socket treatment, and asked him . . . to get in touch with an eye, ear, nose, and throat specialist. . . . I observed swelling about his neck on the left side of his neck and some soreness. . . . The treatment I gave in connection with the extraction of the tooth on 25 April was the treatment that is usually followed by members of my profession, and was the general and approved treatment. . . . In consequence of his asking me to pull it, and because of the fact that I thought it ought to be pulled, then I treated it in the manner that teeth are treated by dentists who are preparing to pull that kind of a tooth. I made an X-ray picture of the tooth before I extracted it. I saw that the roots were straight, and that there would not be any difficulty in extracting the tooth. . . . It was just a pure, clean extraction. . . . So far as the extraction is concerned, it had been successful, and the wound was healing up successfully, and there was going to be an uneventful recovery. At the time I saw him on Monday everything was in good shape. He had had an operation at the Mayo Clinic in Rochester for an ulcerated stomach. . . . I saw him on Friday, 1 May, at the hospital. At that time the swelling had increased and it had moved slightly toward the under part of the jaw. After that, about seven or eight o'clock p.m. on Friday, the incision was made. I was present. That was a week after I had pulled the tooth. . . . The incision was made in toward the center of the throat in order to drain the condition. . . . He died the next morning about two o'clock a.m.

He died suddenly. From the information I had as to the manner of his death, it was my opinion that he died from an embolus. That is the opinion of all the doctors. An embolus is due to a blood clot or some foreign body in the blood that is passing through the heart. It can come from some tissue sloughing from a recent wound, or come from an air bubble, or come from a blood clot, or come from anything that cuts off the arteries. It is entirely possible that infection could have gone into that socket at some time after extraction, and this condition would have set up. . . . It is hard to say definitely whether or not this condition came from the extraction of that tooth. It all lies in this: Every tooth that is extracted is infected, every socket is infected. We have hundreds of organisms in the mouth, so that a patient recovering from a condition like that, it might be fatal, resting entirely on the resistance of the patient to the type of organisms."

Dr. Schoonover testified: "I was called to see him on Thursday, 30 April, 1931. He was unable to speak. I noticed his jaw and neck enormously swollen on the left side. . . . In my opinion, an infection caused that condition, the condition from which he was suffering. The only infection that would be virulent enough would be what we call streptococcus germs or organisms. . . . It is indefinite how long after that germ is contracted or enters the blood stream before its effects are seen in swelling or otherwise. It can be twenty-four or forty-eight hours. . . . He was carried to the hospital the next morning. . . . At that time he had elevated temperature, his neck was enormously swollen, he could scarcely turn his head, he was unable to speak, suffering great pain. . . . The other physician and I finally decided to operate. The operation was performed, but I did not get around until about eleven o'clock that night. In the meantime he had been operated on. . . . The operation apparently did give relief. . . . Streptococcus infection was the contributing cause, and there was probably an embolus that was the immediate cause of death. An embolus is a clot of anything that gets in the blood stream and circulates in the blood stream and lodges in the artery of the heart. . . . A clot quite frequently follows an operation. Quite frequently following an operation a patient is relieved of the trouble for which the operation was had and then dies from a blood clot, as a result of the operation. . . . In order for the streptococci germ to get into the blood stream, it has to have an avenue of entrance, a port of entrance, a raw surface. I did not see at any time I saw Mr. Scott what I call a port of entrance or raw surface other than the place where this tooth had been extracted. Probably the embolus could have come from this operation. . . . In my opinion the condition from which Mr. Scott was suffering and which necessitated this operation was an infection, . . . and in my opin-

ion that infection came in consequence of a streptococcus germ entering the blood stream from some source and from some place. It usually develops itself in twenty-four or forty-eight hours. No rule about that, that is usually so. Any exposed surface that is broken permits the entry means of those germs on any part of the body."

Dr. R. O. Lyday testified as follows: "I saw Mr. Scott about five or ten minutes after his death. His death was sudden and unexpected. I believe his death was caused from a coronary embolism. . . . An infection of this kind does not usually follow the extraction of a tooth. . . . Streptococci germs getting into the blood stream manifest their presence usually immediately. I meant in just a few hours. . . . Usually an embolus is more common during illness or following an operation. . . . It is possible that his death might be disconnected entirely from the operation or from the extraction of the tooth. This streptococcus germ may be present in the mucus lining. It is rare. . . . I don't believe the swelling would have started in the adjacent area to the opening of the tooth socket. . . . The pulling of the tooth and the following of the blood clot could have left it in perfect condition, but some days after that he could have by chewing or in some other way reopened that surface and then permitted those streptococci germs to have gotten in. . . . There is no way that anybody can tell whether or not this condition came from an infection that got into his blood stream at the time this tooth was pulled. . . . I have only an opinion as to where it came from. It could have come from this tooth or it could have come from other places. The reason we believed it came from the tooth was the locality it entered. It is our opinion the thing that caused his death was this embolus. The embolus came from the operation. That was the immediate cause."

There was evidence that prior to the time of the extraction of the tooth that the insured was in good health.

The defendant paid the face of the policies, but declined to pay the double indemnity.

The defendant offered no evidence, and at the conclusion of plaintiff's evidence made a motion of nonsuit, which was denied.

Thereupon, the trial judge submitted the following issues:

1. "Did the death of Robert B. Scott result, directly and independently of all other causes from bodily injuries effected solely through external, violent, and accidental means within ninety days from the occurrence of such accident?"

2. "Was such accident evidenced by a visible contusion or wound on the exterior of the body?"

3. "What amount, if any, is the plaintiff entitled to recover of the defendant?"

The jury answered the first and second issues "Yes," and the third issue "$2,000."

From judgment upon the verdict, the defendant appealed.

*Hines & Boren for plaintiff.*
*Sapp & Sapp for defendant.*

BROGDEN, J. If a tooth is extracted, upon request of the insured, by a competent and skillful dentist, who performs the operation in the usual and ordinary manner, with proper and sterile instruments, employing the requisite degree of care and skill, and thereafter an embolus develops from infection, producing death, can the beneficiary recover double indemnity provided in a policy of insurance for such death resulting "directly and independently of all other causes from bodily injuries effected solely through external, violent, and accidental means," etc. ?

Undoubtedly the insured met an accidental death, but the determinative question is whether such death was produced by "external . . . accidental means." The plaintiff proceeds upon the theory that the extraction of the tooth produced a port of entry for streptococcus germs, and that these germs in turn ultimately produced the embolus resulting in death. Hence, the inquiry arises: Was such port of entry the result of "external, . . . accidental means"?

The courts and textwriters are divided into two opposing camps in solving the relative significance to be given the terms "accidental death" and "external . . . accidental means." Literally hundreds of cases have been written upon the subject, and while many of them may be distinguished from the facts in the case at bar, nevertheless many of them in principle are directly in point, and it is useless to attempt to harmonize the trend of judicial thought. Indeed, it must be conceded that the two lines of reasoning are parallel. There are three cases which illustrate the divergence of reasoning and are typical in every particular among a host of cases, far too numerous to discuss or cite. These cases are *Lewis v. Ocean Accident & Guarantee Corporation,* 120 N. E., 56, 7 A. L. R., 1129; *Caldwell v. Travelers' Ins. Co.,* 267 S. W., 907, 39 A. L. R., 56; *Landress v. Phoenix Ins. Co.,* 291 U. S., 491. The opinion in the *Lewis case, supra,* was written for the New York Court by *Justice Cardozo.* The *Caldwell case, supra,* was written for the Missouri Court by presiding *Justice Blair,* and the *Landress case, supra,* was written by *Mr. Justice Stone,* with *Mr. Justice Cardozo* dissenting.

The fundamental difference between the two schools of thought upon the question of law involved is stated clearly and at length in the *Caldwell case, supra.* The opinion declares: "There are two clearly defined lines of cases on this question. One holds that, where an unusual or

unexpected result occurs by reason of the doing by insured· of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.

"The other line of cases holds that, where injury or death is the unusual, unexpected, or unforeseen result of an intentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which caused such injury or death.

"Industrious counsel have cited an imposing array of cases from this and other jurisdictions. In the number of cases cited respondent has far outdone the appellant. By actual count, her counsel has cited 116 cases and textwriters to this point alone. Such a formidable array has challenged the interest and industry of the writer to undertake the laborious, although not entirely unpleasant, task of examining every case cited. The great majority of those cases are found not to be in point on the question before us."

Thereupon, the opinion analyzes the Missouri decisions upon the subject and many of the leading cases in other jurisdictions. The conclusion reached by the writer of the opinion is as follows: "Defendant insured only against death or injury suffered through accidental cause of insured's death. Assuming that insured's death was caused by the operation voluntarily undertaken and admittedly performed in a skillful manner, plaintiff must show that something unforeseen, unusual, or unexpected and unintended occurred during the progress of the operation, and that this something caused insured's death. It is not enough that there be suspicion, guess, possibility, or speculation that something unexpected, unusual, or unforeseen occurred during the operation." A thumb-nail sketch of the facts in the *Caldwell case, supra,* is that the insured's bowels became obstructed in an unusual and unexpected manner as a result of a skillful operation performed on him for hernia, causing death.

The *Lewis case, supra,* disclosed that the insured voluntarily punctured a pimple on his lip, resulting in death from inflammation of the brain. *Justice Cardozo* said: "We think there is testimony from which a jury might find that the pimple had been punctured by some instrument, and that the result of the puncture was an infection of the tissues. If that is what happened, there was an accident. We have held that infection resulting from the use of a hypodermic needle is caused by 'accidental means.' . . . ·Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself,

the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. . . . The punctured wound is an adequate cause. The evidence suggests no other. . . . Here, as elsewhere, the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions."

In the *Landress case, supra,* the insured voluntarily exposed himself, under normal conditions, to the sun while playing golf, resulting in death from sunstroke. The pertinent language of the disability clause in the policy was substantially similar to that in the policy involved in this suit. The Supreme Court of the United States, speaking through *Mr. Justice Stone,* declared: "Petitioner argues that the death, resulting from voluntary exposure to the sun's rays under normal conditions, was accidental in the common or popular sense of the term, and should therefore be held to be within the liability clauses of the policies. But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unsuspected, extraordinary, an unlooked-for mishap, and so an accident,' . . . for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. . . . This distinction between accidental external means and accidental result has been generally recognized and applied where the stipulated liability is for injury resulting from an accidental external means." See, also, *Harris v. Ins. Co.,* 204 N. C., 385, 168 S. E., 208; *Mehaffey v. Ins. Co.,* 205 N. C., 701, 172 S. E., 331.

In the case at bar liability must rest upon the theory that the extraction of the tooth made a port of entry for death-dealing germs residing in the mouth or body of the insured, and that such germs produced an infection resulting in an embolus, producing death. It is manifest that the chain of causation must begin at the extraction of the tooth. However, the evidence discloses that such extraction was intentional, skillfully done in the ordinary and usual manner, with no mishap, unforeseen element, or misadventure. Furthermore, such extraction was the means, cause, or agency resulting ultimately in death. Therefore, if such cause or agency was intentional, usual, and expected, can it be said that such cause or agency was accidental, or constituted "external . . . accidental means?"

After a full examination of pertinent authorities, this Court is of the opinion that the line of cases or school of thought denying liability under such circumstances is in accord with the greater weight of reason and

justice, and the motion for nonsuit should have been sustained. More-over, the experts who testified at the trial were unable to say whether the embolus developed from the extraction of the tooth or the subsequent operation, and consequently the real cause of the death is left in fog and conjecture.

Reversed.

CLARKSON, J., dissents.