**Ethel Hill GERALD, Plaintiff,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,**
**Defendant.**

**Civ. A. No. C-47-G-65.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Jan. 26, 1966.

Jordan, Wright, Henson & Nichols, Greensboro, N. C., for plaintiff, Welch O. Jordan, Charles E. Nichols, and Edward Lewis Murrelle, Greensboro, N. C., of counsel.

Sapp & Sapp, Greensboro, N. C., for defendant, by Armistead W. Sapp, and Armistead W. Sapp, Jr., Greensboro, N. C., of counsel, and Rollins & Rollins, Greensboro, N. C., by Clyde T. Rollins, Greensboro, N. C., of counsel.

HAYES, District Judge:

This litigation arises out of an accident insurance policy written by defendant to Pilot Life Insurance Company (including its affiliates but excluding Jefferson Standard Life Insurance Co.) by which defendant insures Pilot's employees against loss from injury caused by accident while on a business trip in furtherance of Pilot's business. It obligated itself to pay the designated benefits "for loss resulting directly and independently of all other causes from injury sustained. Injury * * * means bodily injury caused by accident and sustained under the circumstances and in the manner described in the attached Hazards Insert."

The Hazards Insert Title is a standard printed form prepared by defendant. In large letters is its Title: "24 HOUR ACCIDENT PROTECTION WHILE ON A TRIP OUTSIDE CITY LIMITS— BUSINESS ONLY."

The insert is made a part of the contract and "is subject to all of the exceptions, provisions, limitations and other terms of the policy." Under the heading, "Description of Hazards" is the language giving rise to this litigation. "The hazards against which insurance is provided under this policy are injury sustained by the insured person 'while on the business of the Policy holder' and during the course of any bona fide trip made by the Insured Person, provided such trip requires the Insured Person to travel outside the corporate limits of the town or city in which he is regularly employed or has his residence (excluding everyday travel to and from work and bona fide vacations)". "Such trip shall be deemed to have commenced when the Insured Person leaves his residence, or place of regular employment for the purpose of going on such trip, whichever last occurs, and shall continue until such time as he returns to his residence or place of regular employment, whichever first occurs." There follows a paragraph of additional exclusions, listing six different types of flying, but none excluding negligence on the part of the insured nor concerning alcohol. It defines the term "While on the business of the policy holder' as used in this policy means during any trip authorized by or at the direction of the policy holder for the purpose of furthering the business of the policy holder."

It will be observed that the policy covers the employees of Pilot at the home office and elsewhere in the 22 states where it engages in the insurance business. There is no restriction as to the length or duration of the trip and it affords protection 24 hours a day during the existence of the trip.

■ "The place of regular employment" of an insured employee depends on the circumstances, the nature, location and services he renders his employer and to that extent is ambiguous. American Fidelity and Casualty Co. v. London and Edinburgh Insurance Co., 4 Cir., 354 F.2d 214.

■ It is the law of North Carolina that a contract of insurance be construed most strongly against the insurer and most liberally in favor of the insured, especially where the language is ambiguous or is susceptible of more than one construction but where the language is plain and susceptible of only one reasonable construction, the courts will en-

force the contract according to its terms. Walsh v. United Insurance Co., 265 N.C. 634, at 638–639, 144 S.E.2d 817.

There are certain facts here as to which there is no conflict. William A. Gerald was a vice-president and employee of Pilot with a definite place of employment. He was the executive vice-president in charge of the production of certain types of insurance with two vice-presidents under him, one in immediate charge of one of the two divisions. Their offices were on the fourth floor of the main office building, in which Gerald had a suite of offices assigned to him with his two secretaries and his files. Here he discharged the duties of his job-regularly from 8:30 A.M. to 4:30 P.M., Monday through Friday, as he had been doing for several years. On the day of his death he had worked at his office until 4:30 P.M., and would have returned to his home had he not been required to go to the Pilot Country Club building to attend an agency dinner, to make a pep talk to the agents, and to deliver an award to each agent with ten years of service for Pilot.

The defendant contends that his place of regular employment means the 132 acre tract of land owned by Pilot and on which are located the main office building and the Pilot club house where Gerald died; that since the insured did not leave the premises of his employer there was no trip and hence no coverage. There is no evidence that his services to Pilot were rendered all over the 132 acres of land but regularly from his office on the fourth floor of the main office building. Indeed the evidence fails to disclose that Pilot made regular use of the club house for its business. Occasionally it was used like it was the night of Gerald's death. It is true he was one of eight executives who could authorize the use of the club house but there is no evidence that he did this with any regularity. The club house and the lake near it were established by Pilot for the enjoyment of its employees who were permitted to fish or swim in the lake and to entertain their friends at their own expense at the club house. No regular employee stayed at the club house except the caretaker who had an office in it. With that exception all of Pilot's employees at the home office worked in one of the four buildings attached to each other with the main building being the center of activities. No part of the 132 acres was inside of the corporate limits of a town or city.

■ Applying the settled principle of giving the words of a contract their plain and reasonable meaning, it is clear that "the place of (Gerald's) regular employment" was the main office building and when he left the parking lot adjacent to the main office building to go elsewhere on a business trip for his employer, he was on a trip status until he returned to "the place of his regular employment" or his residence, whichever was first. But he died while on that trip. The mere fact that the trip was only .3 of a mile from the main building is unimportant. The express language of the policy states a trip will be deemed "to commence when he leaves the place of his regular employment."

If the defendant had intended or desired "the place of regular employment" to mean the premises or entire tract of land owned by Pilot it should have put it in the contract.

■ When we interpret the phrase "place of regular employment" and giving each word its plain everyday general meaning, as the law requires, we find "place" a general word which may, or may not, signify a specific point; "regular" means usual, customary or general; "employment" means job or services or business for another. Therefore the precise place where Gerald regularly performed his services for his employer could be none other than the main office building in his office. On this theory of the case plaintiff is entitled to a directed verdict in her favor.

Although the trip was only .3 of a mile from his "place of regular employment", still it was a trip commenced at "the place of his regular employment"

and was in that status when Gerald died. The evidence also shows without contradiction Gerald was there on business of his employer at a dinner which Pilot arranged and paid for and pursuant to a request of its officers and the approval thereof, including the President. A directed verdict in favor of the plaintiff is proper on this phase of the case.

The remaining question relates to the question whether the death of the insured was caused by accident resulting "directly and independently of all other causes". An accident policy with the same definition was before the Fourth Circuit in Metropolitan Life Ins. Co. v. Henkel, 234 F.2d 69 in which Judge Parker, speaking for the Court and construing the contract under North Carolina law, held that the death of the insured was an accident, although he was violating the law by driving at the dangerous speed of 90 miles an hour while fleeing from officers, and was killed by injuries sustained when his car turned over. On the question of the accident, he said: "An injury, or death, results from accidental means as distinguished from an accidental result * * * if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury," citing Fletcher v. Security Life and Trust Co., 220 N.C. 148, 16 S.E.2d 687. "Here the driving of the car was the act which preceded the injury * * * and in that act 'something unforeseen, unexpected and unusual' occurred which produced the injury, i. e. the turning over of the car."

On the subject of the insured's negligence he said: "It is true, of course, that insured was exposing himself to danger in driving the car at such a high rate of speed; but 'voluntary exposure to danger by the holder of an accident insurance policy will not defeat recovery for an injury caused by accidental means, where such exposure is not an exception in the policy, and the insured has no intention of producing the injury received.'" "Nor does the fact that the speed of the automobile was in violation of law affect the coverage of the policy, in the absence of an exception to that effect."

"'If insurance companies desire to avoid liability on such ground, they should insert a clause in their policies to that effect'". To the same effect is the elaborate opinion by Judge Soper in Pilot Life Insurance Co. v. Ayers, 163 F.2d 860 (4 Cir.). There the insured was drunk and sat on the window sill in his hotel room from which he fell and was killed. The recovery was sustained because there was no exclusionary clause in the policy.

These two cases cover both the fact that death was caused by accident and that neither the negligence, if any, of the insured nor the presence of alcohol in his blood avail the defendant.

The Coroner tested Gerald's blood for alcohol content and found it was .28. However, the test he made was later found to be inaccurate as some of the ingredients had become contaminated. All of the witnesses present at Gerald's death who testified were in agreement that Gerald was perfectly normal; no sign of intoxication; entirely coherent in his speech, and nothing in his actions to indicate his being under the influence of alcohol. Mrs. Gregory who was seated by him and conversed with him immediately before the accident so testified. Surely these adults would have detected it if he had been intoxicated.

But defendant insists that voluntary acts are not an accident, relying on Mehaffey v. Provident Life & Accident Ins. Co., 205 N.C. 701, 172 S.E. 331; Langley v. Durham Life Insurance Co., 261 N.C. 459, 135 S.E.2d 38; Scarborough v. World Insurance Co., 244 N.C. 502, 94 S.E.2d 558; Fletcher v. Security Life & Trust Co., 220 N.C. 148, 16 S.E.2d 687; Fallins v. Durham Life Ins. Co., 247 N.C. 72, 100 S.E.2d 214 and Slaughter v. State Capital Life Ins. Co., 250 N.C. 265, 108 S.E.2d 438.

In the Mehaffey case there was a failure to prove death resulted by accident or accidental means. It is inapplicable to the facts in the instant case.

In the Langley case the policy was conditioned that if the insured "[S]hall sustain bodily injury effected directly through external, violent and accidental means, exclusively and independently of all other causes" which are materially different from the terms of the policy in suit. In that case there was no evidence that his death was caused by accident. Scarborough v. World Insurance Co., supra, distinguishes between death by "accident" and "accidental means". The policy there required the death to be by accidental means and the insured was the aggressor in an assault which resulted in his death. Recovery was denied on that ground. In Fletcher v. Security Life & Trust Co., supra, distinguishes between "accidental death" and "accidental". The death in that case followed the administration of an anesthetic intentionally injected and recovery was denied because death was not by "bodily injuries effected through external, violent and accidental means, where there is a visible contusion or wound on the exterior part of the body." The evidence failed to establish these provisions. Fallins v. Durham Life Insurance Co., supra, where the insured was shot accidentally by a third party to frighten the insured and another boy engaged in a fight, and a recovery was sustained. The rulings there are favorable to the plaintiff here. Finally Slaughter v. State Capital Life Insurance Co., supra, it was held there was no coverage because of failure to prove that death resulted from accident. As was well said by Justice Higgins: "Each opinion must be interpreted in the light of the facts in the case."

■ The evidence here establishes conclusively that a piece of steak lodged in the insured's throat, completely blocking his windpipe and caused his death. There is not the slightest evidence that the insured did it voluntarily or under circumstances from which he could anticipate death or bodily harm. This object caused the death of the insured as effectively as would death resulting from the heart being penetrated by a bullet.

It was an unexpected and accidental death caused directly and solely by the object shutting off his windpipe.

There is not the slightest evidence that alcohol as such was an effective, immediate and direct cause of death. The blocking of his windpipe, being the sole cause of death, would have killed him whether sober or drunk. If, as defendant contends, the alcohol might have played some part in his swallowing the meat, it amounts to nothing more than what happened in Pilot Life Insurance Co. v. Ayers, supra, and Metropolitan Life Insurance Co. v. Henkel, supra. The mere remote or indirect cause falls short of an immediate proximate cause. Hence, on this phase of the case plaintiff is entitled to a directed verdict.

Due proof of loss was filed with defendant Oct. 28, 1964. The defendant has been due the plaintiff $100,000.00 since that date, and is liable for interest thereon at 6% from then until paid, and the costs to be taxed by the Clerk. Judgment will be entered accordingly.